William J. Leahy, Esquire
WL-8514
Littler Mendelson, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3000 (t)
267.402.3131 (f)
Attorneys for Defendants
Covance Inc. and Nigel Brown

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MDS INC. and MDS PHARMA SERVICES (US) INC., | CIVIL ACTION |
| Plaintiffs, | No. 07-3207 (FLW) |
| v. | |
| COVANCE INC. and NIGEL BROWN, | **ORDER GRANTING DEFENDANT NIGEL BROWN'S MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNTS I, IV, AND V OF THE COMPLAINT** |
| Defendants. | |

THIS MATTER having been opened to the Court by Littler Mendelson, P.C., attorneys

for Defendant Nigel Brown ("Mr. Brown"), on notice to Day Pitney LLP, attorneys for Plaintiffs

MDS Inc. and MDS Pharma Services (US) Inc., and the Court having considered the

submissions in support thereof and in opposition to the requested relief,

IT IS, on this _____ day of _____ ORDERED that:

1.     Mr. Brown's Motion is GRANTED; and

2.     Counts I, IV, and V of the Complaint are DISMISSED WITH PREJUDICE.

BY THE COURT:

_____
Freda L. Wolfson, U.S.D.J.

William J. Leahy, Esquire
WL-8514
Littler Mendelson, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102.1321
267.402.3000 (t)
267.402.3131 (f)
Attorneys for Defendants
Covance Inc. and Nigel Brown

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MDS INC. and MDS PHARMA SERVICES (US) INC., <br><br> Plaintiffs, <br><br> v. <br><br> COVANCE INC. and NIGEL BROWN, <br><br> Defendants. | CIVIL ACTION <br><br> No. 07-3207 (FLW) <br><br><br> **NOTICE OF DEFENDANT NIGEL BROWN'S MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNTS I, IV, AND V OF THE COMPLAINT** |

TO:    Maureen C. Pavely, Esquire
       Day Pitney LLP
       P.O. Box 1945
       Morristown, NJ 07962
       mpavely@daypitney.com

PLEASE TAKE NOTICE that on December 3, 2007, at 9:00 a.m., or as soon thereafter

as counsel may be heard, the undersigned attorneys for Defendant Nigel Brown ("Mr. Brown")

shall move before the United States District Court for the District of New Jersey for the entry of

an order granting judgment on the pleadings as to Counts I, IV, and V of the Complaint pursuant

to Fed. R. Civ. P. 12(c).

PLEASE TAKE FURTHER NOTICE that in support of this Motion, counsel for Mr.

Brown will rely upon the accompanying Brief in Support of Motion for Judgment on the

Pleadings as to Counts I, IV, and V of the Complaint and accompanying exhibits.

Respectfully submitted,

/s/William J. Leahy
William J. Leahy
Littler Mendelson, P.C.
Three Parkway, Suite 1400
1601 Cherry Street
Philadelphia, PA 19102
267.402.3012
267.402.3131 (Fax)
wleahy@littler.com

OF COUNSEL:
Marguerite S. Walsh
Littler Mendelson, P.C.
Three Parkway, Suite 1400
1601 Cherry Street
Philadelphia, PA 19102
267.402.3016
267.402.3131 (fax)
mwalsh@littler.com

Attorneys for Defendants
Covance Inc. and Nigel Brown

Date: November 5, 2007

Littler Mendelson, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3000 (t)
267.402.3131 (f)
Attorneys for Defendants
Covance Inc. and Nigel Brown

| | |
|---|---|
| MDS INC. and MDS PHARMA SERVICES (US) INC., | CIVIL ACTION |
| Plaintiffs, | No. 07-3207 (FLW) |
| v. | |
| COVANCE INC. and NIGEL BROWN, | |
| Defendants. | |

---

## BRIEF IN SUPPORT OF DEFENDANT NIGEL BROWN'S MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNTS I, IV, AND V OF THE COMPLAINT

---

William J. Leahy, Esquire
WL-8514
OF COUNSEL:
Marguerite S. Walsh, Esquire

## TABLE OF CONTENTS

I.     Introduction............................................................................................................1

    A.    Background............................................................................................1

    B.    The Facts Alleged by MDS Preclude It from Prevailing on Counts I, IV and V....2

II.    Facts......................................................................................................................4

    A.    Mr. Brown's Employment With Phoenix and MDS.................................4

    B.    Mr. Brown Accepts Employment With Covance.....................................9

    C.    MDS Files Suit Against Mr. Brown and Covance.................................10

III.    Argument.............................................................................................................11

    A.    Standard for Judgment on the Pleadings..................................................11

    B.    Pennsylvania Contract Law Applies to This Case..................................12

    C.    The MDS Agreement Supersedes the Phoenix Agreement....................12

          1.    The MDS Agreement Addresses the Same Subject Matter and Is Made by the Same Parties as the Phoenix Agreement, But the Agreements Contain Many Terms which are Inconsistent So that the Two Cannot Stand Together.............................................................................12

          2.    The Language of the Subsequent MDS Agreement Makes Clear the Parties' Intent that it Supersedes the Prior Phoenix Agreement................14

    D.    If This Court Finds that the Phoenix Agreement Applies, MDS' Breach of Contract Claim Should Nonetheless Be Dismissed.................................15

    E.    MDS Cannot Sustain a Claim For Promissory Estoppel........................16

    F.    MDS Cannot Sustain a Claim For "Misrepresentation".........................19

IV.    Conclusion...........................................................................................................22

# TABLE OF AUTHORITIES

## CASES

*Bayside Prison Litigation*, 190 F. Supp. 2d 755, 760 (D.N.J. 2002) ............................................ 11

*Bechtel Corp. v. Local 215, Laborers' Int'l Union of North America*, 405 F. Supp. 370, 375
    (M.D. Pa. 1975) ....................................................................................................................... 12

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) ..................................................... 11

*Bortz v. Noon*, 729 A.2d 555, 560-61 (Pa. 1999)........................................................................... 18

*Caribe Hilton Hotel v. Toland*, 307 A.2d 85 (N.J. 1973) ............................................................... 11

*Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983) ............ 14

*Dopp v. Yari*, 927 F. Supp. 814, 818 (D.N.J. 1996)....................................................................... 11

*Friestad v. Travelers Indemnity Co.*, 393 A.2d 1212, 1217 (Pa. Super. 1978) ............................ 14

*H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 143 (N.J. 1983) ....................................................... 18

*Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d Cir. 1995) ................................................. 14

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) ......................................................... 11

*Konover Constr. Corp. v. East Coast Constr. Svcs. Corp.*, 420 F. Supp. 2d 366, 370 (D.N.J.
    2006) ....................................................................................................................................... 18

*Lauro Lines v. Chasser*, 490 U.S. 495 (1989) .............................................................................. 15

*Malaker Corp. Stockholders Protective Cmte. v. First Jersey Nat'l Bank*, 395 A.2d 222, 230
    (N.J. Super. App. Div. 1978) .................................................................................................. 16

*Morningstar v. Hallett*, 858 A.2d 125, 129 (Pa. Super. 2004)...................................................... 13

*Pepsico, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) ................................................... 16

*National Starch & Chem. Corp. v. Parker Chem. Corp.*, 530 A.2d 31, 33 (N.J. Super. App. Div.
    1987)........................................................................................................................................ 16

*Robb v. Philadelphia*, 733 F.2d 274, 277 (3d Cir. 1984)............................................................... 11

*Robert Grace Contracting Co. v. Norfolk and W. Ry. Co.*, 102 A. 956 (Pa. 1918)...................... 12

*RTC Mortgage Trust 1994 N-1 v. Fidelity Nat'l Title Ins. Co.*, 58 F. Supp. 2d 503, 529 (D.N.J.
    1999)  18

*Spruill v. Gillis*, 372 F.3d 218, 223 n. 2 (3d Cir. 2004) ................................................................ 11

*Sullivan v. Chartwell Investment Partners, LP*, 873 A.2d 710, 717-18 (Pa. Super. 2005) .......... 16

*Sun Co. v. Brown & Root Braun, Inc.*, Civ. A. No. 98-6504, 1999 WL 681694, *2 (E.D. Pa. Sept.
    2, 1999) ................................................................................................................................... 14

*Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets, Inc.*, 636 A.2d 156,
    160-61 (Pa. 1994)................................................................................................................... 16

*The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)....................................................... 15

*Veazey v. Doremus*, 510 A.2d 1187, 1189 (N.J. 1986).................................................................. 18

## I.    INTRODUCTION

### A.    Background

On June 1, 2006, Nigel Brown, a former employee of Plaintiffs MDS Inc. and MDS

Pharma Services (U.S.) Inc. (collectively "MDS") left MDS and joined Covance Inc.  Nearly a

year later – on April 12, 2007 – MDS sued Mr. Brown and Covance in federal court in Indiana.

Despite MDS's efforts to portray Mr. Brown's actions as striking at the very heart of its business,

the only thing that changed from the day he left until the day that MDS sued him is the

successful prosecution of a suit by Covance against MDS and a former Covance employee,

James Dixon.[1]  The instant suit, which MDS successfully moved to transfer to this Court in July,

and which it has done little to prosecute since, is nothing more than MDS' attempted payback for

the *Dixon* suit.

MDS claims that Mr. Brown will inevitably disclose MDS' confidential information in

his position with Covance; this alleged fact  was known to MDS on the day Mr. Brown left, and

nothing has changed, except the *Dixon* lawsuit.  MDS claims that Mr. Brown is subject to a non-

competition agreement which restricts his post-employment activities; this alleged fact  was also

known to MDS on the day Mr. Brown left and, again, with the exception of the *Dixon* lawsuit,

nothing has changed.

---

[1] In *Covance, Inc v. MDS Pharma Services, Inc. and James Dixon*, 1:07-cv-0409-JDT-JMS (S.D. Ind.), Covance successfully obtained a temporary restraining order against Mr. Dixon, a former Covance employee, and MDS, his new employer. Covance brought the case within eleven days of Mr. Dixon's departure based in part on information discovered through forensic examination of Mr. Dixon's Covance computer. The Temporary Restraining Order prohibited Mr. Dixon from working for or consulting with MDS in any way. (A copy of the Temporary Restraining Order is attached hereto as Exhibit A.)  Following the entry of the Temporary Restraining Order, the litigation resolved with the entry of a Consent Order. Two days after the entry of the Temporary Restraining Order, MDS brought this suit. On MDS' own motion, it was transferred to this Court by Order dated July 2, 2007. On July 27, 2007, Mr. Brown and Covance served their Initial Disclosures and proposed Joint Discovery Plan. Mr. Brown and Covance also included written discovery. MDS served its initial disclosures on July 12, 2007 but, despite being the plaintiffs allegedly in need of relief, did not contact Defendants' counsel to prepare the discovery plan and hold a Rule 26(f) conference until late August. MDS did not serve written discovery until September 6, 2007.

MDS' belated and clearly retaliatory lawsuit contains five counts:  breach of contract, misappropriation of trade secrets, tortious interference with contract, promissory estoppel, and misrepresentation. MDS claims that Mr. Brown's employment with Covance (1) violates a purported non-competition agreement to which he is subject – one which, even if MDS is correct (and it is not), has since expired and which contains a Quebec forum selection clause that MDS ignores, and (2) Mr. Brown's current employment will inevitably cause him to disclose MDS' trade secrets – a purported result known to MDS when Mr. Brown first joined Covance, more than a year ago.

Even apart from the untimeliness of and questionable motivation behind MDS' lawsuit, with the pleadings closed, it is apparent that several of MDS' claims against Mr. Brown warrant dismissal for the following reasons:

- A later agreement between MDS and Mr. Brown  supersedes the agreement on which MDS bases its claims and such later agreement does not include a noncompetition provison.

- Alternatively, assuming arguendo that the prior agreement  under which MDS sues is currently in effect, such prior agreement requires any claims to be brought in Quebec.

- MDS' promissory estoppel and misrepresentation claims should be dismissed because the facts pled preclude MDS from establishing that it justifiably relied on a purported promise made by Mr. Brown.

**B.    The Facts Alleged by MDS Preclude It from Prevailing on Counts I, IV, and V.**

Count I of MDS' Complaint alleges that Mr. Brown's employment with Covance violates an Employment Agreement for Senior Executive ("the Phoenix Employment Agreement") with Phoenix International Life Services Inc. ("Phoenix") dated in or about February 1999.  MDS alleges that the Phoenix Employment Agreement with Mr. Brown applies because MDS purchased the stock and acquired ownership of Phoenix in June 2000, thereby acquiring the

2

contractual rights and obligations of Phoenix. The Phoenix Employment Agreement contains a one-year, post-employment non-compete.[2]

After MDS acquired Phoenix, MDS entered into a new employment agreement with Mr. Brown on November 6, 2000 ("the MDS Agreement"). (A copy of the MDS Agreement is Exhibit B to the Complaint). The MDS Agreement—which does not contain a noncompetition provision-- supersedes the Phoenix Agreement as a matter of law for the following reasons:

- The MDS Agreement changes or replaces salient terms of the Phoenix Agreement, including those terms dealing with salary, bonus, stock options, benefit plan, retirement program, vacation, and fitness club dues.

- The MDS Agreement contains a nondisclosure provision (as does the Phoenix Agreement), but, as noted above, contains no noncompetition provision.

- The MDS Agreement contains no general provision continuing or incorporating the terms of the Phoenix Agreement; rather, it specifically limits such continuation to those terms relating to transition support in the event of termination as outlined in the Phoenix Agreement and the Phoenix Change of Control Agreement.

Because the MDS Agreement, not the Phoenix Agreement, was in effect at the time of Mr. Brown's resignation on May 22, 2006, MDS' claim that Mr. Brown's employment with Covance is a breach of contract fails as a matter of law. The MDS Agreement does not contain a noncompetition provision and thus cannot bar Mr. Brown from being employed by Covance.

Moreover, even if, as MDS contends in its Complaint, the Phoenix Agreement were still in effect, it would require a merger of the Phoenix Agreement with the MDS Agreement.

---

[2] The Phoenix Employment Agreement states, in part:

In consideration of the grant of options referred to in article 11.5 hereof by PHOENIX, the Employee covenants and agrees that he or she shall not at any time within the period of one (1) year following the termination of his or her employment hereunder, on his or her behalf or on behalf of any person, whether directly or indirectly, in any capacity whatsoever, alone, through or in connection with any person, compete or be employed by a business which competes with the Business anywhere within Canada, the United States of America, the European Common Market or Switzerland.

(Phoenix Employment Agreement at Art. 6.1 (A copy of the Phoenix Employment Agreement is Exhibit A to the Complaint, which is attached hereto as Exhibit B)).

3

Reading these two agreements together, there is a single forum selection provision: Article 2.6 of the Phoenix Agreement requires that any litigation arising out of the agreement be brought in the Courts of the Province of Quebec, Canada.[3] Despite relying on the Phoenix Agreement to impose a noncompetition restriction on Mr. Brown, MDS ignores this forum selection clause in the very same agreement thereby contradicting its position that the Phoenix Agreement is still in effect. Even if we assume, for the sake of argument, that MDS' view regarding survival of the Phoenix Agreement is correct, Count I, the breach of contract claim, should be dismissed as MDS cannot maintain it in this court.

In addition to the breach of contract claim, Counts IV and V of MDS' Complaint assert claims of promissory estoppel and misrepresentation. These claims also fail because MDS has not pleaded facts to support a necessary element of each: the reasonable and justifiable reliance of MDS on any promise or representation by Mr. Brown.

## II.    FACTS

### A.    Mr. Brown's Employment With Phoenix and MDS.

The facts viewed in a light most favorable to MDS are as follows: In September 1996, Mr. Brown began his employment with Phoenix. (*See* Compl. at ¶ 15). In or about February 1999, Mr. Brown signed the Phoenix Employment Agreement and became Phoenix's Senior Vice President and Chief Information Officer. (*Id*. at ¶ 16, Ex. A). In June 2000, MDS acquired Phoenix and Phoenix's agreement with Mr. Brown. (*Id.* at ¶ 17). After this acquisition, in November 2000, MDS issued to Mr. Brown a new "offer of employment" with MDS, and required Mr. Brown to sign if he "agree[d] with the terms outlined in this letter." (*Id.* at ¶ 19, Ex. B).

---

[3] The Phoenix Employment Agreement provides: "[T]he federal laws of Canada applicable therein and the courts of the Province of Quebec shall be the sole and proper forum with respect to any suits brought with respect to this Agreement." (The Phoenix Employment Agreement at Art. 2.6).

4

The original Phoenix Employment Agreement and the subsequent MDS Agreement address the same subject matter – Mr. Brown's employment – and were made by the same parties – MDS (as successor to Phoenix for the Phoenix Employment Agreement) and Mr. Brown. Although the two agreements, not unexpectedly, address many of the same subjects (e.g. title, salary, benefits and the like), they differ in many respects.

Set forth below is a table that compares key provisions of the two agreements on a side-by-side basis:

| Type of Provision | Old Phoenix Agreement | New MDS Agreement |
|---|---|---|
| Title | Senior Vice President and CIO (Compl., Ex. A, Art. 4.1) | *Nov. 2000 – July 2003:* Senior Vice President, Preclinical Drug Development Services.<br>*July 2003 – Nov. 2004:* Senior Vice President, Strategic Planning, Technology and Markets.<br>*Nov. 2004 – May 2006:* Senior Vice President, Strategic Business and Technology Planning.<br>(Compl., ¶ 18) |
| Base Salary | ". . . initial annual base salary in the amount of one hundred forty five thousand dollars ($145,000). . . ." (*Id.* at Art. 11.1) | "Your base salary will be $175,000 per annum." (Compl., Ex. B, ¶ 1) |
| Car Allowance | "the Employee will be paid a car allowance of five hundred dollars ($500) monthly. The Employee shall also be reimbursed for mileage traveled in personal automobile up to $5,000 annually." (*Id.* at Art. 11.3) | "MDS will pay you an automobile allowance of $800 per month and provide you with a credit card for gasoline purchases." (*Id.* at ¶ 3) |
| Bonus | ". . . an annual bonus, based on PHOENIX'S Worldwide Executive Remuneration Plan, as same may be amended from time to time. The initial annual bonus shall be 10% on achievement of personal objectives." (*Id.* at Art. 11.4) | You will participate in the Senior Management Bonus Plan. Under this plan, you will have the opportunity to earn 40% of your base salary. The target award of 30% is payable for achieving financial, business and individual objectives. An additional 10% is available for organizational and individual performance that exceeds expectations. (*Id.* at ¶ 2) |
| Stock Options | At the sole discretion of the Board of Directors of PHOENIX, the Employee shall be awarded options to purchase PHOENIX shares on the | Within forty-five days of the close of the deal, you will be granted options to purchase 10,000 common shares of MDS Inc. under the MDS Employee Stock |

5

|  | terms and conditions specified in PHOENIX'S Key Employee Share Option Plan (Schedule 11.5 hereof) as same may be amended from time to time, the whole subject to regulatory approval, if required. The amounts of these options are as follows:<br><br>(a)    On approval by the Human Resources Committee of the Board of Directors, 12,500 shares, in addition to those already awarded.<br><br>(b)    Annually, a number of shares equal to the salary earned by the Employee with the Employer in the previous fiscal year multiplied by 25% and divided by the option price.<br><br>(*Id.* at Art. 11.5) | Option Plan. You will also be eligible for annual grants, which are typically granted in either December of January; you will be eligible for your first annual grant starting with the January 1, 2001 compensation review. (*Id.* at ¶ 4) |
|---|---|---|
| Employee Share Purchase Plan | None | You will be eligible to participate in the MDS Inc. Employee Share Ownership Plan. We anticipate that we will be rolling out participation in the MDS Employee Share Ownership Plan to Phoenix employees based in Canada and the U.S. on August 1, 2000. Under this plan, you can purchase MDS common shares at a 10% discount to the market. The maximum annual contribution is the lesser of 10% of your base salary and $10,000. (*Id.* at ¶ 8) |
| Medical Benefits | Subject to any medical or similar approvals which may be required, the Employee shall have the right to participate in benefit programs and/or plans of the Employer and his or her entitlement to vacation shall be determined and granted in accordance with the policy of PHOENIX at the time the benefits and vacation are granted . . . (*Id.* at Art. 12.1) | "You will be eligible to participate in the MDS Inc. Executive Group Benefit Plan which provides comprehensive dental and extended health coverage, life insurance, accidental death and dismemberment insurance and long term disability." (*Id.* at ¶ 5) |
| Vacation | "Employee's annual vacation shall not be less than four weeks (20 working days) in each calendar year." (*Id.* at Art. 12.1) | "You will be provided with 4 weeks vacation immediately." (*Id.* at ¶ 7) |
| Retirement Program | None | You will be eligible to participate in the MDS Senior Management Retirement Program. MDS will pay a benefit equal to 10% of your base salary to the |

6

| | | |
|---|---|---|
| | | program.    The    first    $13,000    is contributed to a defined contribution pension plan, while the remainder is credited    to    a    non-registered supplementary account. (*Id.* at ¶ 6) |
| Fitness Club/Health Services | None | "MDS will pay your annual dues, up to a maximum of $1,500 for a fitness club and/or recreation membership. You will also be eligible to participate in the Executive Health Services Program". (*Id.* at ¶ 9) |
| Customer Solicitation | In consideration of the grant of options referred to in article 11.5 hereof by PHOENIX, the Employee shall not, for a period of one (1) year following the termination of his or her employment, on the Employee's own behalf or on behalf of any person, whether directly or indirectly, in any capacity whatsoever, alone, through or in connection with any person for any purpose which is in competition, in whole or in part, with the Business:<br><br>8.1.1    solicit any Customer or aid, procure or assist in the soliciting of any Customer; or<br><br>8.1.2  accept, or aid, procure or assist in the acceptance of, any business from any Customer. (*Id.* at Art. 8.1) | None |
| Non-Competition | In consideration of the grant of options referred to in article 11.5 hereof by PHOENIX, the Employee covenants and agrees that he or she shall not at any time within the period of one (1) year following the termination of his or her employment hereunder, on his or her behalf or on behalf of any person, whether directly or indirectly, in any capacity whatsoever, alone, through or in connection with any person, compete or be employed by a business which competes with the Business anywhere within Canada, the United States of America, the European Common Market or Switzerland.    (emphasis added) (*Id.* at Art. 7.1) | None |
| Confidentiality | The Employee hereby agrees that | . . . all material and information |

7

| | | |
|---|---|---|
| | during his or her employment and for a period of three (3) years following the termination of his or her employment, he or she shall not, directly or indirectly, use, divulge, diffuse, sell, transfer, give, circulate, or otherwise exploit for his or her own benefit or for the benefit of any other person, whatsoever or whomsoever, or otherwise make public, any Confidential Information. (*Id.* at Art. 6.1) | concerning our business is highly confidential, and we require that you do not divulge any information of a confidential nature, acquired during the term of your employment, without the prior written consent of MDS. Confidential information is defined as information disclosed to you as an employee as a consequence of your employment by MDS, and is not generally known in the trade or industry in which MDS operates, or that relates to the company's past, present and future products, processes and services. This includes information conceived, originated, discovered, or developed by you, and information relating to the company's research, development, processing, engineering, computer programming and marketing, as well as financial, sales and product planning information. (Compl., Ex. B) |
| Transition Assistance upon Termination | . . .if the Employee's employment be terminated by the Employer without cause, the Employee shall receive after the effective date of termination of his or her employment i) all amounts which are then due and owing to the Employee pursuant to this Employment Agreement, and ii) a further amount (the "Termination Payment") equal to the Employee's gross base annual salary (at the time of notice of termination) divided by 12 and multiplied by the number of complete years (not less than six (6) years) that the Employee has been employed by PHOENIX or any of its subsidiaries or the Employer, less all applicable withholding at source. (*Id.* at Art. 14.1) | "If your employment is terminated by MDS without cause, we will provide you with transition support as outlined in your employment agreement with Phoenix International." (*Id.* at ¶ 10) |
| Governing Law | The Employment Agreement shall be governed by and interpreted and construed in accordance with the Laws of the Province of Quebec and the federal laws of Canada applicable therein and the courts of the Province of Quebec shall be the sole and proper forum with respect to any suits brought with respect to this Agreement. . . . (*Id.* at Art. 2.6) | None |

| Forum | "[T]he federal laws of Canada applicable therein and the courts of the Province of Quebec shall be the sole and proper forum with respect to any suits brought with respect to this Agreement." (*Id.*) | None |

For eleven of the sixteen key contractual provisions noted above, the MDS Agreement either explicitly supersedes the Phoenix Agreement or provides terms that did not exist in the Phoenix Agreement. These are: title, base salary, car allowance, bonus, stock options, employee share purchase plan, medical benefits, retirement program, fitness club/health services, and confidentiality. Two provisions are substantively the same: vacation allotment and transition assistance upon termination. There are four key provisions contained in the Phoenix Agreement that are not repeated in the MDS Agreement: prohibition on customer solicitation, noncompetition, choice of law, and choice of forum.

## B.    Mr. Brown Accepts Employment With Covance.

On May 22, 2006, Mr. Brown resigned his employment with MDS and advised that he had accepted a position with Covance, a direct competitor of MDS. (Compl. at ¶¶ 32, 55). Before leaving, MDS contends that Mr. Brown was engaged in highly confidential, sensitive and strategic discussions about the future direction of Pharma Services. (*Id.* at ¶ 33).

At the time of his departure, MDS claims that Mr. Brown was "intimately familiar with, and fully armed with, MDS' most current, sensitive, confidential and proprietary strategic and financial information." (Compl. at ¶ 33.) Further, MDS states that "on a daily basis, Mr. Brown used Pharma Services' proprietary, confidential and trade secret information of every nature and kind, and he was deeply involved in each and every one of the business units of Pharma Services," and that he "inevitably took that information when he left Pharma Services, and he has used, and continues to use, that information since joining Covance." (*Id.* at ¶¶ 37-38). The

nature of the information to which Mr. Brown had access allegedly included MDS' financial statements, strategic plans, marketing intelligence, business intelligence, sales strategy and presentations, pricing of products and services, product development, strategic direction of product development, and research studies. (*Id.* at ¶ 45).

## C.   MDS Files Suit Against Mr. Brown and Covance.

Despite these allegations about Mr. Brown's agreement, as well as the supposed value of MDS' information and the inevitability of its disclosure, MDS waited nearly a year before filing this lawsuit against Mr. Brown and Covance. In its Complaint, MDS relies on the Phoenix Employment Agreement to allege that Mr. Brown "has a contractual obligation to refrain from working for any MDS and/or Pharma Services competitor for a one-year period after the termination of his employment at MDS and/or MDS Pharma Services." (*See* Compl. at ¶ 54). MDS contends that Mr. Brown's employment with Covance violates the Phoenix Employment Agreement. (*Id.* at ¶ 55). In Count IV of the Complaint, MDS asserts a claim of promissory estoppel. In support of this claim, MDS contends that Mr. Brown promised MDS that "he would maintain the highest professional integrity and would protect the propriety, confidential and sensitive information" he had from MDS. (Compl. at ¶73). MDS alleges that, based on these representations, it did not previously sue Mr. Brown and Covance. (Compl. at ¶75). Based upon the same allegations, MDS also brings a misrepresentation claim against Mr. Brown in Count V. (Compl. at ¶¶79-80).

Mr. Brown now seeks the dismissal of Counts I, IV, and V of the Complaint under Fed. R. Civ. P. 12(c) as the facts alleged are not sufficient to maintain plausible claims against him.[4]

---

[4] Mr. Brown previously filed separate Motions for Judgment on the Pleadings as to Counts I and as to Counts IV and V while this matter was pending in the Southern District of Indiana. Due to its transfer to this Court, Mr. Brown now submits this Motion to consolidate the previous Motions and address the differing analyses resulting from the fact that the case is now pending in this Court rather than a federal court in Indiana.

10

## III.    ARGUMENT

### A.    Standard for Judgment on the Pleadings

In this Motion for Judgment on the Pleadings, the Court applies the same standard as on a motion to dismiss under Rule 12(b)(6). *See Spruill v. Gillis*, 372 F.3d 218, 223 n. 2 (3d Cir. 2004). Thus, under Fed. R. Civ. P. 12(c), the court takes the allegations in the Complaint as true, viewed in the light most favorable to MDS. *See Robb v. Philadelphia*, 733 F.2d 274, 277 (3d Cir. 1984). To survive a motion to dismiss or a motion for judgment on the pleadings, the Complaint must state factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). In considering a motion challenging the pleadings, the Court looks for "plausibility" in the Complaint. *Id.* at 1970.

Ordinarily, a court decides a motion under Rule 12(c) relying only upon the allegations of the complaint without considering outside documents. Where, as here, the plaintiffs attach documents to the Complaint, however, the Court may consider those documents without converting the motion into a motion for summary judgment. *See In re Bayside Prison Litigation*, 190 F. Supp. 2d 755, 760 (D.N.J. 2002).

### B.    Pennsylvania Contract Law Applies to This Case.

A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487 (1941). In contract cases, New Jersey courts apply the law of the jurisdiction "'having the most significant relationship to the parties and to the transaction.'" *Dopp v. Yari*, 927 F. Supp. 814, 818 (D.N.J. 1996) (quoting *Caribe Hilton Hotel v. Toland*, 307 A.2d 85 (N.J. 1973)).

Because Mr. Brown worked for MDS in Pennsylvania, and because he now works for Covance in New Jersey, MDS contends that either Pennsylvania or New Jersey law applies to its

11

agreement (*See* Pls' Mem. of Law in Opp'n to Defs' Mot. for Partial Judgment on the Pleadings at p. 9, fn 4). As New Jersey has no apparent relationship to Mr. Brown's employment by MDS, only Pennsylvania appears to meet these requirements. Applying Pennsylvania law, it is the MDS Agreement, rather than the Phoenix Employment Agreement, that controls.

      **C.**     **The MDS Agreement Supersedes the Phoenix Agreement**

           **1.**     **The MDS Agreement Addresses the Same Subject Matter and Is Made by the Same Parties as the Phoenix Agreement, But the Agreements Contain Many Terms which are Inconsistent So that the Two Cannot Stand Together.**

Pennsylvania recognizes the principle of general contract law that a new contract between parties will supersede a previous agreement if its execution would make execution of the previous contract impossible. *See Robert Grace Contracting Co. v. Norfolk and W. Ry. Co.*, 102 A. 956 (Pa. 1918). Thus, when the parties "make a new agreement that is inconsistent with the terms of a previous one dealing with the same subject matter, the later agreement operates to rescind and to discharge by substitution the inconsistent parts of the earlier contract." *Bechtel Corp. v. Local 215, Laborers' Int'l Union of North America*, 405 F. Supp. 370, 375 (M.D. Pa. 1975) (citations omitted) aff'd., 544 F. 2d 1207 (3d Cir. 1976).

This basic principle of contract law applies squarely here. As illustrated by the side-by-side comparison of the two arguments in the statement of facts, the subsequent contract between MDS and Mr. Brown addresses the same subjects, yet contains numerous terms that are inconsistent with the original Phoenix Agreement. First, when Mr. Brown entered into the Phoenix Agreement, he became Phoenix's Senior Vice President and CIO. (*See* Compl., Ex. A, § 4.1). When Mr. Brown entered into the MDS Agreement on November 6, 2000, he assumed the position of Senior Vice President, Preclinical Drug Development Services. (*See* Compl., Ex. B). Mr. Brown entered into a new and separate agreement for a different job.

12

Second, the two agreements contain contradictory provisions on essential terms such as salary, car allowance, bonus, stock options, insurance benefits, and confidentiality obligations. These differences also support the conclusion that the MDS Agreement supersedes the Phoenix Agreement and applies in full force. (*See* Compl., Exs. A & B).

In executing the MDS Agreement, it is clear that it was the parties' intent to create a new and separate agreement. *See, e.g., Morningstar v. Hallett*, 858 A.2d 125, 129 (Pa. Super. 2004) ("[t]he paramount goal of contractual interpretation is to give effect to the intent of the parties"). Indeed, MDS acknowledges as much by stating in the MDS Agreement that the MDS compensation plan contains differences "with the approach taken at Phoenix." (*See* Compl., Ex. B at p. 3).

## 2. The Language of the Subsequent MDS Agreement Makes Clear the Parties' Intent that It Supersedes the Prior Phoenix Agreement

Instead of having a general clause incorporating by reference the entire seventeen-page Phoenix Agreement, the MDS Agreement specifically limits such incorporation to a single provision from the Phoenix Agreement. The MDS Agreement states:

> If your employment is terminated by MDS without cause, we will provide you with transition support as outlined in your employment agreement with Phoenix International (dated February 1, 1999) and the Phoenix Change of Control Agreement.

(Compl., Ex. B at p. 3)There is no similar provision in the MDS Agreement providing that the noncompetition or nonsolicitatation provisions of the Phoenix Agreement—or, for that matter, any of the other provisions of the Phoenix Agreement-- would remain in effect. Had MDS wished to do so, it could easily have drafted the agreement to achieve that result.

Courts strive to avoid a contract interpretation that would render a clause or section meaningless. *See Sun Co. v. Brown & Root Braun, Inc.*, Civ. A. No. 98-6504, 1999 WL 681694,

13

*2 (E.D. Pa. Sept. 2, 1999); *Morningstar*, 858 A.2d at 129 ("the law does not assume that the

language of the contract was chosen carelessly"); *Friestad v. Travelers Indemnity Co.*, 393 A.2d

1212, 1217 (Pa. Super. 1978). To interpret the MDS Agreement to include the noncompetition

provision from the Phoenix Employment Agreement would do exactly that, it would render the

above-referenced incorporation of the Phoenix Employment Agreement provisions on

employment termination a nullity. By including this specific reference to a specific portion of

the Phoenix Agreement, the parties to the MDS Agreement clearly understood that the MDS

Agreement would replace the Phoenix Agreement and that the other terms of the Phoenix

Agreement would not continue to apply to the employment relationship between Mr. Brown and

MDS, unless explicitly incorporated by reference into the MDS Agreement.[5]

     For all of the reasons discussed above, the MDS Agreement controls. That agreement

contains no noncompetition provision; consequently, Count I should be dismissed.

### D.    If This Court Finds that the Phoenix Agreement Applies, MDS' Breach of Contract Claim Should Nonetheless Be Dismissed.

     Federal law determines the effect of a forum selection clause because this issue is

procedural rather than substantive. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d Cir.

1995). Forum selection clauses are presumptively valid. *Coastal Steel Corp. v. Tilghman*

*Wheelabrator, Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983), *overruled on other grounds by Lauro*

---

[5] To the contrary, the MDS Agreement specifically acknowledges that other aspects of employment at MDS would be different from those at Phoenix without specifically contradicting provisions in the Phoenix Agreement. The Agreement states:

> The structure of the MDS compensation program has both similarities and differences with the approach taken at Phoenix. To help you fully understand the approach we take at MDS, we will be arranging for you to meet with Keri Humber, who has responsibility for our corporate compensation programs, including executive compensation. He will provide you with the details of the various programs. . . .

(Compl., Ex. B) Thus, MDS' intent was simply to obviate the Phoenix terms and apply the MDS compensation plan without having to enumerate every last term. For example, the Phoenix Agreement provided that Brown would have an "expense account up to $10,000 for business purposes. . . ." MDS did not bother to amend or delete this provision in the new MDS Agreement because the previous Phoenix Employment Agreement had been substituted.

*Lines v. Chasser*, 490 U.S. 495 (1989). The Supreme Court has held that such provisions are enforceable unless doing so would be "unreasonable" under the circumstances. *See The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972).

The Phoenix Agreement specifically states that "the Courts of the Province of Quebec shall be the sole and proper forum with respect to any suits brought with respect to this Agreement." (*See* Compli, Ex. A at ¶ 2.6). MDS ignores this provision of the purported contract on which they sue in bringing this lawsuit in the wrong country – first in the Southern District of Indiana and now in this Court.

Should this Court find that the MDS Agreement does not supersede the Phoenix Agreement and, consequently, that the two documents actually form one agreement between the parties, then the forum selection provision would preclude MDS from bringing Count I of the Complaint in this Court and therefore, Count I should be dismissed in its entirety.

### E.    MDS Cannot Sustain a Claim For Promissory Estoppel

Count IV of MDS' Complaint asserts a claim for promissory estoppel. MDS claims that "When Brown resigned from MDS and/or Pharma Services, he promised he would maintain the highest professional integrity and would protect the proprietary, confidential and sensitive information to which he had been privy while working for Pharma Services," and that "Brown made these promises to prevent MDS and/or Pharma Services from enjoining him from working for Covance." (Compl. at ¶¶73-74.) Even assuming that Mr. Brown made the alleged statement, this does not support a claim for promissory estoppel.

Under Pennsylvania law,[6] the doctrine of promissory estoppel requires the following elements:

---

[6] Pennsylvania law applies to MDS' promissory estoppel claim for the same reason it would apply to its breach of contract claim. Even if New Jersey law applied, the Court's analysis would not be different because the elements

15

(1)     the promisor made a promise that he should have reasonably expected would induce action or forbearance by the promisee;

(2)     the promisee actually took action or refrained from taking action in reliance on the promise; and

(3)     injustice can be avoided only by enforcing the promise.

*Sullivan v. Chartwell Investment Partners, LP*, 873 A.2d 710, 717-18 (Pa. Super. 2005).

To meet the third element, the plaintiff must show that its reliance on the promise was

reasonable. *Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets,*

*Inc.*, 636 A.2d 156, 160-61 (Pa. 1994). Even if MDS could establish the other elements

of such a claim, the facts it has pleaded foreclose the possibility of establishing the third

element.

Throughout the Complaint, MDS makes clear that its misappropriation of trade secrets

claim against Brown is based, in whole or in part, upon the theory of inevitable disclosure. (*See*

Compl. at ¶¶ 37, 38, 43). Under this doctrine, a plaintiff may establish "trade secret

misappropriation by demonstrating that [the] defendant's new employment will *inevitably* lead

him to rely on the plaintiff's trade secrets." *Pepsico, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th

Cir. 1995) (emphasis added); *see also National Starch & Chem. Corp. v. Parker Chem. Corp.*,

530 A.2d 31, 33 (N.J. Super. App. Div. 1987) (recognizing doctrine of inevitable disclosure as

basis for injunction under New Jersey law). Under this theory, by virtue of his very employment

with Covance, Mr. Brown will inevitably use MDS' trade secrets.

MDS' reliance on this theory flies in the face of its promissory estoppel claim. As noted

above, MDS must show that its reliance on the promise allegedly made by Mr. Brown was

---

are substantively the same. New Jersey articulates four elements to a promissory estoppel claim: (1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that the promisee will rely thereon; (3) the promisee must in fact reasonably rely on the promise; and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise. *Malaker Corp. Stockholders Protective Cmte. v. First Jersey Nat'l Bank*, 395 A.2d 222, 230 (N.J. Super. App. Div. 1978) (citation omitted).

reasonable. Unreasonable reliance cannot support a promissory estoppel claim. In *Thatcher's*, for example, the plaintiff sought to recover under promissory estoppel where it claimed that the defendant, an adjacent tenant, had promised not to open a competing business. *Thatcher's,* 636 A.2d at 59-60. Notwithstanding this promise, the defendant had the right under its lease to open a competing business. In repeated negotiations, the plaintiff had not received a contract protecting it from competition. *Id.* At 160. Under the circumstances, the Court held that, as a matter of law, it was unreasonable for the plaintiffs to rely on an indefinite promise from the defendant. *Id.*

Similarly, given MDS' allegations that Mr. Brown's disclosure of its confidential information was inevitable, any reliance upon the alleged promise by Mr. Brown was unreasonable. If Mr. Brown's disclosure of MDS confidential information were inevitable, then it was inevitable at the time he began working at Covance – more than 14 months ago. Such inevitability – the existence of which MDS is so certain that it has made it a central part of a federal court complaint – precludes any claim to have reasonably relied on a promise by Mr. Brown not to disclose confidential information. Consequently, MDS cannot prove any set of facts to establish that it reasonably relied on Mr. Brown's alleged promise and, therefore, its promissory estoppel claim should be dismissed.

### F.    MDS Cannot Sustain a Claim For "Misrepresentation."

In Count V of the Complaint, MDS alleges a claim for "misrepresentation" relying upon the same promise allegedly made by Mr. Brown underlying the promissory estoppel claim. For instance, MDS states: "When Brown resigned from MDS and/or Pharma Services, he promised he would maintain the highest professional integrity and would protect the proprietary, confidential and sensitive information to which he had been privy while working for Pharma

17

Services," and that "Based on Brown's explicit representations, MDS and Pharma Services did not, at that time, pursue an action against Brown or Covance for misappropriation of their confidential, proprietary and trade secret information and/or violation of Brown's contractual obligations to MDS and Pharma Services." (Compl. ¶¶ 79-80.) MDS does not state whether its "misrepresentation" claim is for fraudulent misrepresentation or negligent misrepresentation. Regardless of which theory it is pursuing, Count V should be dismissed.

As an initial matter, the Court must determine the appropriate law to be applied. For tort claims, New Jersey applies the governmental interest analysis to choice of law decisions. *See Veazey v. Doremus*, 510 A.2d 1187, 1189 (N.J. 1986). Under this choice of law test, the Court proceeds on an issue-by-issue basis. *Id.* The first step in this analysis is to determine whether there is a conflict between the law of the interested states. *Id.* In the absence of a conflict, the Court applies the law of the forum state. *RTC Mortgage Trust 1994 N-1 v. Fidelity Nat'l Title Ins. Co.*, 58 F. Supp. 2d 503, 529 (D.N.J. 1999). If an actual conflict exists, the Court identifies the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties. *Veazey*, 510 A.2d at 1189.

In this case, the state in which Mr. Brown made the statement from which MDS attempts to derive its misrepresentation claim is Pennsylvania.[7] Pennsylvania, like New Jersey, recognizes claims of "intentional misrepresentation" and "negligent misrepresentation." *See Bortz v. Noon*, 729 A.2d 555, 560-61 (Pa. 1999) (discussing elements of both claims under Pennsylvania law); *Konover Constr. Corp. v. East Coast Constr. Svcs. Corp.*, 420 F. Supp. 2d 366, 370 (D.N.J. 2006) (elements of fraudulent misrepresentation under New Jersey law); *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 143 (N.J. 1983) (discussing elements of negligent

---

[7] Although not explicit in the Complaint, given that Mr. Brown worked for MDS in Pennsylvania, it is undisputed that the alleged statement was made there. (*See* Pls' Mem. of Law in Opp'n to Defs' Mot. for Part. Judgment on the Pleadings at p. 9 fn 4.)

misrepresentation in New Jersey). The elements of both claims under Pennsylvania law are not substantively different from those required to establish such claims in New Jersey. Both New Jersey and Pennsylvania require the plaintiff to establish "justifiable reliance" on the misrepresentation made by the defendant. *See Bortz*, 729 A.2d at 560-61; *Konover*, 420 F. Supp. 2d at 370; *H. Rosenblum*, 461 A.2d at 143. Accordingly, this Court should apply New Jersey law to this claim.

Just as with its promissory estoppel claim, the facts that MDS pleads in the Complaint preclude any claim for misrepresentation. MDS claims that, due to the nature of Mr. Brown's positions and knowledge at MDS, his disclosure of MDS' confidential information at Covance is inevitable. (*See* Compl. at ¶43). Under MDS' own theory of the case, then, such disclosure would have occurred regardless of even the most stringent precautions taken by Mr. Brown or Covance. Consequently, MDS cannot maintain that any reliance on statements by Mr. Brown that he would not disclose MDS confidential information was justifiable. MDS cannot rely on a promise not to disclose information that, according to MDS, will inevitably be disclosed; the two notions are inherently and fundamentally contradictory. Similarly, its reliance on such statements could not have been the proximate cause of any injury it suffered. Accordingly, MDS cannot maintain a misrepresentation claims against Mr. Brown.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Brown and Covance respectfully request that Counts I, IV

and V of the Complaint should be dismissed with prejudice.

Respectfully submitted,

/s/William J. Leahy
William J. Leahy
Littler Mendelson, P.C.
Three Parkway, Suite 1400
1601 Cherry Street
Philadelphia, PA 19102
267.402.3012
267.402.3131 (Fax)
wleahy@littler.com

OF COUNSEL:
Marguerite S. Walsh
Littler Mendelson, P.C.
Three Parkway, Suite 1400
1601 Cherry Street
Philadelphia, PA 19102
267.402.3016
267.402.3131 (fax)
mwalsh@littler.com

Attorneys for Defendants
Covance Inc. and Nigel Brown

Date: November 5, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on this ____day of November, 2007, a copy of the foregoing was

filed electronically.  Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.


Maureen C. Pavely, Esquire
Day Pitney LLP
P.O. Box 1945
Morristown, NJ 07962
mpavely@daypitney.com
973-966-8165
Attorneys for MDS


/s/William J. Leahy
William J. Leahy