**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| COVANCE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) 1:07-cv-409-JDT-JMS |
| | ) |
| JAMES DIXON and MDS PHARMA | ) |
| SERVICES, INC., | ) |
| | ) |
| Defendant. | ) |

## Temporary Restraining Order

The Plaintiff's Motion for a Temporary Restraining Order is **GRANTED**. Defendant James Dixon is enjoined from working for or consulting with MDS Pharma Services (US) Inc. (MDS) in any capacity. He is also enjoined from violating the Confidentiality and Non-Competition Agreement he executed in favor of Covance, Inc. on March 10, 2005. Further, he is enjoined from directly or indirectly using, disclosing or retaining any proprietary, confidential or trade secret information of Covance.

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, this temporary restraining order, which was issued orally at approximately 5:00 P.M. on April 9, 2007, shall be in effect for 10 days, that is, until April 23, 2007, and may be extended for up to another 10 days for good cause shown.

A written entry elaborating on the reasons announced in open court for the issuance of this temporary restraining order will follow.

Covance is required to post security in the amount of $150,000, which may be in the form of a surety bond or the deposit of that sum with the Clerk of this court. The security is required pursuant to Rule 65(c) of the Federal Rules of Civil Procedure for the payment of such costs and damages which may be incurred or suffered if it is later found that this temporary restraining order was wrongfully issued.

This restraining order does **not** prohibit MDS from communicating information about its business to Defendant Dixon during this period. Dixon may review such information, but he cannot work for or consult with MDS during this period, or use Covance proprietary or trade secret information in connection with his review of MDS information. In other words, there could be a "one way street" of information from MDS to Dixon regarding MDS business, which would enable Dixon to prepare to work on

MDS matters when he is no longer on the sidelines because of a restraining order or injunction arising from this case.

ALL OF WHICH IS ORDERED this 10th day of April 2007.

John Daniel Tinder, Judge
United States District Court

Copies to:

Michael A. Moffatt
Littler Menderlson, P.C.
mmoffatt@littler.com

Craig W. Wiley
Littler Menderlson, P.C.
cwiley@littler.com

Melanie E. Harris
Ice Miller, LLP
melanie.harris@icemiller.com

Michael A. Blickman
Ice Miller, LLP
michael.blickman@icemiller.com

Danielle Vanderzanden
Day Pitney, LLP
One International Place
Boston, MA 02110
dyvanderzanden@daypitney.com

Joy E. Taylor
Day Pitney, LLP
One International Place
Boston, MA 02110
jetaylor@daypitney.com

Magistrate Judge Jane Magnus-Stinson

**EXHIBIT B**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

MDS INC. and MDS PHARMA            )
SERVICES (US) INC.,                )
                                   )
               Plaintiff,          )
                                   )
v.                                 )        Case No.
                                   )
COVANCE INC. and NIGEL BROWN,      )   **1 : 0 7 -cv- 0 4 5 5 -SEB -JMS**
                                   )
               Defendants.         )
                                   )

## COMPLAINT

Plaintiffs MDS Inc. ("MDS") and MDS Pharma Services (US) Inc. ("Pharma Services")

("collectively "Plaintiffs") hereby file the following Complaint against Defendants Covance Inc.

("Covance") and Nigel Brown ("Brown") (collectively "Defendants").

## INTRODUCTION

1.    MDS and Pharma Services bring this action seeking all appropriate damages and

equitable remedies arising out of the wrongful conduct of Brown, a former Pharma Services

employee, and Covance, one of Pharma Services' primary competitors. Upon information and

belief, Covance and Brown have misappropriated and used Plaintiffs' confidential, proprietary

and trade secret information and have unlawfully usurped Pharma Services' business. Covance

has committed these wrongful acts by hiring Brown, Pharma Services' highest-level strategic

and corporate development executive, who had access to and has used Pharma Services' most

highly confidential, strategic, corporate development and trade secret information relating to

Pharma Services' business, the services that Pharma Services provides, and Pharma Services'

strategic plans, negotiations, acquisition candidates, alliance partners and business direction.

51379939.3

Brown has committed these wrongful acts by violating his noncompetition and confidentiality agreements with MDS and Pharma Services and, upon information and belief, by unlawfully misappropriating, using, and disclosing to Covance MDS's and Pharma Services' confidential, proprietary and trade secret information.

## PARTIES

2.      Plaintiff MDS is a corporation organized under the laws of the Province of Ontario with a principal place of business in Mississauga, Ontario, Canada.

3.      Plaintiff Pharma Services is a corporation organized under the laws of Nebraska with a principal place of business in King of Prussia, Pennsylvania.

4.      Defendant Covance is a corporation organized and existing under the laws of the State of Delaware. Its principal place of business is located in Princeton, New Jersey.

5.      Defendant Brown is a citizen of New Jersey and currently resides in Princeton, New Jersey.

6.      Brown is Covance's Vice President of Business Development and Strategy and works primarily in Covance's executive offices, located in Princeton, New Jersey.

## JURISDICTION AND VENUE

7.      This Complaint is filed and the jurisdiction of this Court invoked pursuant to 29 U.S.C. § 1332(a)(1), (2) and (3) as the Defendants are citizens of different states than the Plaintiffs, and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) as Defendant Covance resides in this district, is subject to personal jurisdiction in this district, and has assented to venue in this district. In addition, Defendant Brown has assented to jurisdiction and venue in this district.

## STATEMENT OF FACTS

### Background

9.      MDS is a global life sciences company that provides market-leading products and services that customers use for the development of drugs and diagnosis and treatment of disease. It is a leading global provider of pharmaceutical contract research, medical isotopes for molecular imaging, radiotherapeutics, and analytical instruments.

10.     Pharma Services is a leading global contract research organization ("CRO") that provides drug discovery and development services, both early-stage and late-stage development, to pharmaceutical and biotech companies around the world.  Pharma Services helps companies bring new drugs to market by applying scientific expertise to each stage of the drug discovery and development process through:  identifying promising leads for new drugs; ruling out unpromising leads early in the process; conducting clinical trials to test the safety and effectiveness of new drugs; and navigating the drug regulatory environment.

11.     MDS and Pharma Services have achieved, and will continue to maintain, their present competitive advantage by preserving the confidentiality of their competitively sensitive business development and strategic information, including, without limitation its:  business strategy and direction, strategic initiatives, acquisition targets, strategic alliances, growth opportunities, marketing strategies; potential new service offerings; regulatory and quality assurance programs; bids and proposals for drug development services; costing, pricing and profitability, models and practices; current and future business plans; financial data; clients; key accounts; network of customers and potential customers; network of partners and potential target partners; and other strategic opportunities.

12.    MDS takes great care to maintain the confidential and trade secret nature of such information by, for example, requiring employees to sign confidentiality agreements, requiring certain key employees to sign non-compete agreements, maintaining restrictive information technology systems and employing standards and procedures that limit information disclosure of confidential information to those employees who have a business-based need to know such information.

13.    The need for confidentiality is particularly acute given the highly sensitive work involved on behalf of MDS's and Pharma Services' clients. If information about this work were disclosed, it would irreparably harm these clients' business interests in the highly competitive business of providing services to pharmaceutical and biotechnology clients.

14.    If this information were to become available to a competitor or to become public knowledge, MDS's and Pharma Services' competitive advantage and the substantial investments they have made in developing their business strategy, marketing their services, and in developing and maintaining their relationships with clients, potential partners and acquisition targets would be irreparably injured and/or destroyed. Now, Covance has acquired and is continuing to use this very information by hiring MDS's and Pharma Services' key executive.

## Covance's Hiring of Brown

15.    Brown began working for Phoenix International Life Services Inc. ("Phoenix") in or about September 1996. At that time, he signed a Confidentiality, Proprietary Rights, Regulatory Compliance and Non-Competition Agreement. This agreement, in part, prohibited Brown from competing with Phoenix for twelve (12) months following his termination of employment from Phoenix.

16.     In or about February 1999, Brown executed an Employment Agreement for Senior Executive ("Senior Executive Agreement"). (A true and correct copy of Brown's Senior Executive Agreement is attached as Exhibit A.) This agreement includes a one-year restriction against engaging in competitive activity. Specifically, the Senior Executive Agreement provides:

> 7.1    In consideration of the grant of options referred to in article 11.5 hereof by PHOENIX, the Employee covenants and agrees that he or she shall not at any time within the period of one (1) year following the termination of his or her employment hereunder, on his or her own behalf or on behalf or on behalf of any person, whether directly or indirectly, in any capacity whatsoever, alone, through or in connection with any person, compete or be employed by a business which competes with the Business anywhere within Canada, the United States of America, the European Common Market or Switzerland.

> 8.1    In consideration of the grant of options referred to in article 11.5 hereof by PHOENIX, the Employee shall not, for a period of one (1) year following the termination of his or her employment, on the Employee's own behalf or on behalf of any person, whether directly or indirectly, in any capacity whatsoever, alone, through or in connection with any person for any purpose which is in competition, in whole or in part, with the Business:

> 8.1.1    solicit any Customer or aid, procure or assist in the soliciting of any Customer; or

> 8.1.2    accept, or aid, procure or assist in the acceptance of, any business from any Customer.

17.     In or around June 2000, MDS acquired all of the stock of Phoenix and acquired ownership of the business, including all of the contracts into which it had entered with any of its employees.

18.     Following that acquisition, Brown began working for Pharma Services as Senior Vice President, Preclinical Drug Development Services. In July 2003, Brown became Pharma Services' Senior Vice President, Strategic Planning, Technology, and Markets. In November 2004, he assumed the role of Senior Vice President, Strategic Business and Technology Planning.

51379939.3                                    -5-

19.     As a condition of his employment with MDS and/or Pharma Services, Brown was required to abide by the terms of the Senior Executive Agreement MDS acquired from Phoenix and to sign an MDS employment agreement (the "MDS Agreement"). He signed the MDS Agreement on November 6, 2000. (A true and correct copy of the MDS Agreement is attached as Exhibit B.)

20.     By signing the MDS Agreement, Brown recognized and acknowledged that certain material and information concerning the business of MDS and Pharma Services is highly confidential. He further acknowledged that he would not, at any time, divulge, use or misappropriate any information of a confidential nature that he acquired during his employment with MDS and/or Pharma Services.

21.     In his positions as Senior Vice President, Strategic Planning, Technology, and Markets and Senior Vice President, Strategic Business and Technology Planning, Brown was responsible for designing, developing, communicating and implementing Pharma Services' strategic plan; sourcing and negotiating strategic initiatives; and identifying, evaluating and effecting acquisitions to grow the business and capabilities across all of Pharma Services' lines of business. He had intimate knowledge of the most confidential, potential strategic initiatives that Pharma Services planned or contemplated making, including, without limitation, potential service offerings, special programs, joint ventures, alliances, strategic investments, acquisitions, and divestitures. He was intimately involved in designing, developing and implementing all of the confidential short-term and long-term strategies for MDS and Pharma Services.

22.     For instance, he founded, developed and led the Biomarker Alliance and other strategic initiatives. Through such strategic and developmental activities, he evaluated the strategic value of and engaged in confidential, strategic negotiations and developed important

relationships on behalf of Pharma Services with companies such as Radiant Research ("Radiant"), Gentris Corporation ("Gentris"), Caprion Pharmaceuticals, Inc. ("Caprion") and several others.

23.     Through these discussions, on behalf of Pharma Services, and at substantial cost to Pharma Services, Brown developed and fostered important contacts at and learned and obtained highly confidential information about these and similar companies. He also learned and obtained confidential information about the strategic value of these and numerous other potential business partners.

24.     Through the Biomaker Alliance, as a senior executive on Pharma Services' Senior Leadership Team for Global Early Stage Development Services, in the role of Senior Vice President, Preclinical Drug Development Services, and as Pharma Services' Senior Vice President, Business Planning, Technologies and Markets, Brown designed, developed and directed Pharma Services' strategic initiatives. He not only had access to all of Pharma Services' most confidential, proprietary and trade secret strategic business information; he used it on a regular basis in his business activities for Pharma Services.

25.     For example, he evaluated merger and acquisition projects and managed and directed MDS's Biomarker Alliance initiatives, strategic initiatives and alliances, growth opportunities, marketing strategies; costing, pricing and profitability models; current and future business plans; financial data; clients, key accounts, networks of customers and potential customers; networks of partners and potential target partners; and other strategic opportunities.

26.     With respect to sensitive acquisition targets, only a limited number of people have knowledge of or access to information regarding such targets. Such information is protected through Project Code Names and resides in limited access, password-protected e-

rooms or confidential files. The individuals directly involved in due diligence efforts also generally sign confidentiality agreements specifically related to those due diligence activities. Financial information and some strategy information are password-protected, and MDS and Pharma Services make significant efforts to limit the dissemination of this information.

27.    As a Senior Vice President at Pharma Sevices and member of its senior leadership team, Brown had nearly unfettered access to Pharma Services' confidential and proprietary information and trade secrets. The types of information to which he had access included, but were not limited to, financial statements, strategic plans, marketing intelligence, business intelligence, sales strategy and presentations, pricing of products and services, product development, strategic direction of product development, and research studies.

28.    He regularly reviewed, analyzed and worked with MDS's and Pharma Services' confidential and proprietary information and trade secrets and the confidential and proprietary information and trade secrets of each of Pharma Services businesses. Brown attended monthly meetings of the senior operations team at Pharma Services.

29.    As a member of Pharma Services' senior management team, Brown participated in monthly meetings with senior executives from MDS and Pharma Services, including the Chief Executive Officer, the Chief Financial Officer, the Senior Vice President Human Resources of MDS, and the President, Chief Financial Officer and the other business unit heads and other executives from Pharma Services. In these meetings, confidential and strategic information about Pharma Services was discussed, along with similar information regarding other business units at MDS.

30.    In preparing for and participating in these meetings, he reviewed, analyzed, discussed and distributed copies of confidential PowerPoint presentations that contained highly

sensitive, proprietary financial, customer marketing, business development, research and strategic information central to every facet of the strategic direction, service offerings and developmental objectives of Pharma Services and each of its businesses.

31.      Pharma Services has invested significant sums of money over many years to develop the highly valuable, proprietary and confidential trade secrets possessed by Brown solely as a result of his employment with Pharma Services.

32.      On May 22, 2006, Brown resigned his employment with MDS and Pharma Services and announced that he had accepted a position with Covance that would offer him greater responsibility and provide him with more compensation.

33.      In the spring of 2006, as he was preparing to leave MDS and negotiating to join Covance, Brown was engaged the most highly confidential, sensitive and strategic discussions about the future direction for Pharma Services.  He regularly met with the new president of Pharma Services and, with the executive team, he worked to design and develop a highly confidential, strategic four-year plan for Pharma Services.  He also helped to prepare presentations relating to that strategic plan, while exploring avenues for growth and development.  Thus, when he left Pharma Services to join Covance, he departed intimately familiar with, and fully armed with, Pharma Services' most current, sensitive, confidential and proprietary strategic and financial information.

34.      Brown walked away from Pharma Services and joined Covance knowing every aspect of most of the confidential strategies for the businesses of MDS and Pharma Services.  He also knew the intimate and confidential details about the ways in which Pharma Services intended to enhance its service offerings and improve its profitability through expansions and divestitures.

35.     In addition, he knew confidential details about MDS's and Pharma Services' financial positions and their strategies for funding acquisitions and mergers and their internal usage of funds acquired through planned divestitures, reorganizations and restructurings.

36.     Such plans involve a 36-48 month process.  Accordingly, all of the knowledge and confidential information that Brown had and took with him when he resigned from Pharma Services remains highly relevant.  Moreover, his knowledge of, ability to use and demonstrated use of that information has damaged and will continue to damage MDS in numerous respects.

37.     In other words, on a daily basis, Brown used Pharma Services' proprietary, confidential and trade secret information of every nature and kind, and he was deeply involved in each and every one of the business units of Pharma Services.  He inevitably took that information when he left Pharma Services, and he has used, and continues to use, that information since joining Covance.

38.     Similarly, on a daily basis, Brown was intricately involved in Pharma Services' marketing plans; financial data; clients; key accounts; networks of customers and potential customers; networks of partners and potential target partners; network of strategic alliances and potential strategic alliances; and other strategic opportunities. He inevitably took that information when he left Pharma Services, and he has used, and continues to use, that information since joining Covance.

39.     When Brown resigned from Pharma Services, he stated that he would maintain the highest professional integrity and would protect the proprietary, confidential and sensitive information to which he had been privy while working for Pharma Services.  Based on these explicit representations, Pharma Services did not, at that time, pursue an action against Brown or

Convance for breach of contract, interference with contract or misappropriation of Plaintiffs' confidential, proprietary and trade secret information.

40.    On information and belief, since leaving Pharma Services, Brown has engaged, on behalf of Covance, in strategic discussions with entities such as Gentris, Caprion and Radiant. These are entities with whom Brown had fostered and developed significant relationships while employed by MDS and with whom he had engaged in strategic discussion and negotiations on behalf of MDS.

41.    After Brown joined Covance, Covance acquired eight early-phase clinical pharmacology sites from Radiant. These sites are competitive with the business of Pharma Services, and Brown had learned confidential information about Radiant when he engaged in negotiations and discussions with Radiant on behalf of MDS before resigning to join Covance.

42.    After Brown joined Covance as a senior executive with extensive knowledge of Pharma Services' strategic plans and operations, Covance leveraged its acquisition of Radiant to compete against Pharma Services in the contract research area and to obtain significant business from one of Pharma Services' major customers.

43.    Upon information and belief, in performing his business development and strategic job duties at Covance, Brown inevitably has used and disclosed confidential, proprietary and trade secret information that belongs to MDS and Pharma Services and that he acquired through his work at Pharma Services. In other words, upon information and belief, Brown has used, relied upon and disclosed proprietary, confidential, strategic financial and developmental information, clients, key accounts, networks of customers and potential customers, networks of partners and potential target partners, and networks of strategic alliances and potential strategic alliances that belong to MDS and Pharma Services.

44.    On information and belief, Covance's purpose in hiring Brown was to obtain further confidential information and trade secrets relating to MDS's and Pharma Services' overall business strategies.

45.    By virtue of his employment with Pharma Services, Brown helped develop and had access to MDS's and Pharma Services' most competitively sensitive and confidential information.  This includes information relating to MDS's and Pharma Services' financial statements, strategic plans, marketing intelligence, business intelligence, sales strategy and presentations, pricing of products and services, product development, strategic direction of product development, and research studies.

46.    On information and belief, within months after Brown joined Covance, Brown began to develop the strategic biomarker business at Covance and engaged in these efforts with full knowledge of and based on confidential and proprietary information that he had acquired at MDS.

47.    On information and belief, MDS and Pharma Services allege that Covance and Brown improperly misappropriated MDS's and Pharma Services' confidential and proprietary information and trade secrets and improperly used and disclosed such information in connection with, among other things, establishing a biomarker business.

48.    Moreover, Covance's recent allegations in the matter of Covance, Inc. v. James Dixon and MDS Pharma Services, Inc., Case No. 1:07cv0409 LJM-WTL, which also is pending before this Court and with which the parties wish to consolidate this action (the "Dixon Litigation") demonstrate that Brown cannot perform services for Covance without inevitably using and disclosing Plaintiffs' confidential, proprietary and trade secret information.

49.     In the Dixon Litigation, Covance alleges that James Dixon ("Dixon"), who held at Covance, and will hold at Pharma Services, a less senior position than Brown held at either Covance and/or Pharma Services, cannot work at Pharma Services without disclosing Covance's confidential and proprietary information and trades secrets.

50.     In the Dixon Litigation, Covance maintains that it would suffer harm if Dixon were permitted to work for Pharma Services.  Given the relative levels of responsibility in the roles held by Dixon and Brown, Covance's hiring of Brown must have caused and must be continuing to cause even more substantial harm to Plaintiffs in this action than Dixon's hiring has caused or could cause Covance.  The role Dixon held at Covance principally involved global quality assurance responsibilities for Covance's Central Laboratory business.  Brown's role at Pharma Services involved designing, developing, communicating and implementing Pharma Services' strategic plan and  sourcing and negotiating strategic initiatives.  Brown's day-to-day responsibilities, unlike Dixon's day-to-day responsibilities (which were limited to one of Covance's businesses) spanned each and every business unit at Pharma Services and involved the use of both MDS's and Pharma Services' most sensitive confidential, proprietary and trade secret information.

## COUNT I

### Breach of Contract v. Brown

51.     The averments set forth in Paragraphs 1 through 50 hereof are incorporated by reference herein as if set forth in their entirety.

52.     The Senior Executive Agreement that Phoenix entered into with Brown, and assumed by MDS, is valid, legally enforceable and supported by adequate consideration.

53.     Pursuant to his Senior Executive Agreement with Phoenix, which MDS acquired when it purchased the stock of Phoenix, Brown agreed not to compete or be employed by a

51379939.3                                          -13-

business which competed "with the business of Phoenix, which the Senior Executive Agreement defined to be the business of a multi-service CRO which provides discovery, analytical services, preclinical studies, regulatory affairs services and scientific software products and services to pharmaceutical and biotechnology companies..." for a one-year period after the termination of his employment at MDS and/or MDS Pharma Services. Ex. A at §§ 7.1 and 2.9.

54.    Brown has a contractual obligation to refrain form working for any MDS and/or Pharma Services competitor for a one-year period after the termination of his employment at MDS and/or MDS Pharma Services.

55.    Covance is a competitor of MDS; accordingly, Brown's employment with Covance constitutes a violation of Paragraph 7.1 of the Senior Executive Agreement.

56.    Unless Brown terminates his employment with Covance immediately, he will continue to violate his contractual obligations in the future.

57.    As part of his MDS Agreement, Brown agreed that upon his leaving the employ of MDS and/or Pharma Services, he would not divulge MDS's or Pharma Services' confidential, proprietary and trade secret information.

58.    On information and belief, in misappropriating such confidential proprietary and trade secret information, Brown has breached his contractual obligations to MDS and Pharma Services.

59.    MDS has suffered, and continues to suffer, significant irreparable harm due to Brown's breaches of his contractual obligations.

## COUNT II

### Misappropriation of Trade Secrets v. Brown and Covance

60.    The averments set forth in Paragraphs 1 through 59 hereof are incorporated by reference herein as if set forth in their entirety.

61.    Brown has a common law duty not to misappropriate and disclose the trade secrets and confidential information of MDS and Pharma Services, and not to use or impart such trade secrets and confidential information for the benefit of anyone other than MDS and Pharma Services.

62.    On information and belief, Covance's purpose in hiring Brown was to obtain further confidential information and trade secrets relating to MDS's and Pharma Services' overall business strategies.

63.    On information and belief, MDS and Pharma Services allege that Covance and Brown improperly misappropriated MDS's and Pharma Services' confidential and proprietary information and trade secrets and improperly used and disclosed such information in connection with, among other things, establishing a biomarker business.

64.    Based on Brown's job responsibilities at Covance, and his former responsibilities at MDS, Brown cannot possibly perform his responsibilities at Covance without disclosing MDS's and Pharma Services' trade secrets and confidential information. If Brown were to reveal MDS's and/or Pharma Services' confidential and proprietary business information to Covance, whether inadvertently or otherwise, it would be extremely harmful to MDS's and Pharma Services' competitive position in the marketplace.

65.    MDS and Pharma Services have suffered and will continue to suffer damages as a result of such misappropriation.

66.    Furthermore, on information and belief, Covance has not taken appropriate measures to prevent the misappropriation and disclosure of MDS's and Pharma Services' confidential and trade secret information.

51379939.3                              -15-

## COUNT III

### Tortious Interference v. Covance

67.    The averments set forth in Paragraphs 1 through 66 hereof are incorporated by reference herein as if set forth in their entirety.

68.    By engaging in the conduct described above, Covance has unlawfully and without privilege engaged in unfair competition with and to the detriment of MDS in violation of state law.

69.    On information and belief, in inducing Brown to misappropriate MDS's and Pharma Services' confidential property and trade secret information and in hiring Brown, Covance has tortiously interfered with MDS's and Pharma Services' contractual relationship with Brown and its advantageous business relations with Brown and others.

70.    Covance has intentionally interfered with the contractual relationship between MDS and Brown.

71.    MDS and Pharma Services has and continues to sustain damages as a result of such interference.

## COUNT IV

### Promissory Estoppel v. Brown

72.    The averments set forth in Paragraphs 1 through 71 hereof are incorporated by reference herein as if set forth in their entirety.

73.    When Brown resigned from MDS and/or Pharma Services, he promised he would maintain the highest professional integrity and would protect the proprietary, confidential and sensitive information to which he had been privy while working for Pharma Services.

74.    Brown made these promises to prevent MDS and/or Pharma Services from enjoining him from working for Covance.

75.    Based on Brown's explicit representations, MDS and Pharma Services did not, at that time, pursue an action against Brown or Covance for misappropriation of their confidential, proprietary and trade secret information and/or violation of Brown's contractual obligations to MDS and Pharma Services.

76.    On information and belief, MDS and Pharma Services allege that Covance and Brown improperly misappropriated MDS's and Pharma Services' confidential and proprietary information and trade secrets and improperly used and disclosed such information in connection with, among other things, establishing a biomarker business.

77.    MDS and Pharma Services have and continue to sustain damages as a result of such conduct.

## COUNT V

### Misrepresentation v. Brown

78.    The averments set forth in Paragraphs 1 through 77 hereof are incorporated by reference herein as if set forth in their entirety.

79.    When Brown resigned from MDS and/or Pharma Services, he promised he would maintain the highest professional integrity and would protect the proprietary, confidential and sensitive information to which he had been privy while working for Pharma Services.

80.    Based on Brown's explicit representations, MDS and Pharma Services did not, at that time, pursue an action against Brown or Covance for misappropriation of their confidential, proprietary and trade secret information and/or violation of Brown's contractual obligations to MDS and Pharma Services.

51379939.3                  -17-

81.    MDS and Pharma Services have and continue to sustain damages as a result of such conduct.

WHEREFORE, MDS and Pharma Services pray for:

1.    A permanent injunction, against Brown and Covance and all other persons or entities acting in concert with them or on their own behalf or participating with them as follows:

    a)    enjoining Brown and Covance from, directly or indirectly using, disclosing or retaining any proprietary, confidential or trade secret information of MDS and/or Pharma Services;

    b)    enjoining Brown and Covance from, directly or indirectly, engaging in any marketing, strategic or corporate development negotiations and/or discussions of any kind or nature that involve any of the following:  acquisition targets with which Brown had any involvement or about whom Brown obtained any confidential information as a Pharma Services' employee; any of the strategic alliances or growth opportunities about which Brown obtained any confidential information as an employee of Pharma Services; any of the clients, key accounts, networks of customers and potential customers about whom Brown obtained any confidential information during his tenure as an employee of Pharma Services; or the network of partners and potential target partners or any other strategic opportunities about which Brown obtained any confidential information while working for Pharma Services.

    c)    enjoining Brown and Covance from soliciting, inducing, recruiting, encouraging, assisting, advising or directing any individual who possesses or has access to MDS's and Pharma Services' proprietary, confidential or trade secret information to work for Covance;

51379939.3                                                    -18-

      d)       enjoining Brown from being employed or continuing to be employed by Covance for such a period of time as is necessary to ensure that Brown does not disclose to Covance, or its use for its benefit, whether intentionally or inevitably, MDS's and Pharma Services' proprietary, confidential or trade secret information; and

      e)       enjoining Brown and Covance from taking any action to impair the goodwill or business reputations or good names of MDS and Pharma Services.

2.      A judgment in MDS's and Pharma Services' favor and against Brown and Covance for monetary damages, including, but not limited to, all amounts necessary to compensate MDS and Pharma Services for Brown's and Covance's wrongful activities including MDS's and Pharma Services' reasonable attorney's fees.

3.      A judgment in MDS's and Pharma Services' favor and against Brown and Covance for exemplary damages for its willful and malicious conduct.

      Respectfully submitted,

      MDS INC. and MDS PHARMA
      SERVICES (US) INC.,

      By their Attorneys,

      Michael A. Blickman
      Melanie E. Harris
      ICE MILLER LLP
      One American Square
      Suite 3100
      Indianapolis, IN 46282
      Melanie.harris@icemiller.com
      Michael.blickman@icemiller.com

**EMPLOYMENT AGREEMENT FOR SENIOR EXECUTIVE**

**NIGEL K. BROWN, D.Phil.**

1

**EXHIBIT A**

## EMPLOYMENT AGREEMENT

**MEMORANDUM OF AGREEMENT** entered into at Montreal, Quebec, this 1st day of February 1999.

| | |
|---|---|
| **BY AND BETWEEN:** | **Phoenix International Life Sciences Inc.,** a company duly incorporated under the laws of Canada, having its principal place of business at 2350 Cohen Street, Saint-Laurent, Quebec, Canada H4R 2N6, herein acting and represented by **John W. Hooper**, duly authorized to act hereunder for the purposes of the present Employment Agreement as he declares; |
| | (hereinafter "the "Employer") |
| **AND** | **Nigel K. Brown**, domiciled and residing at 339 Woodcroft, Hudson, Quebec J0P 1H0 |
| | (hereinafter the "Employee") |

### THE PARTIES DECLARE AS FOLLOWS:

**WHEREAS** the Employer wishes to retain the Employee's services for the position set forth in Schedule 4.1 and whereas the Employee wishes to offer his or her services on such basis to the Employer, the whole in accordance with the conditions stipulated in this Employment Agreement;

**WHEREAS** the Employer and the Employee wish to set forth the working conditions governing their employment relationship;

**NOW THEREFORE THIS AGREEMENT WITNESSETH THAT**, in consideration of the mutual promises contained herein, and other good and valuable consideration the adequacy and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

2

# ARTICLE 1
## PREAMBLE

1.1        The Preamble forms an integral part of this Employment Agreement.

# ARTICLE 2
## GENERAL PROVISIONS

2.1        **Headings.** The insertion of headings is for convenience of reference only and shall not affect or be utilized in the interpretation hereof.

2.2        **Severability.** Any article, section, subsection or other subdivision of this Employment Agreement or any other provision of this Employment Agreement which is deemed to be or becomes, illegal, invalid or unenforceable shall be severed herefrom and shall be ineffective to the extent of such illegality, invalidity or unenforceability and shall not affect or impair the remaining provisions hereof which shall remain in full force and effect.

2.3        **Entire Agreement.** This agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, by the parties in respect of its subject matter.

2.4        **Amendment.** No amendment hereto shall be binding unless expressly provided for in an instrument duly executed by the parties hereto.

2.5        **Waiver.** No waiver by any party hereto, whether by conduct or otherwise, of any of the provisions of this Employment Agreement shall be deemed to constitute a waiver by such party of any other provisions nor shall such waiver constitute a continuing waiver hereof, unless otherwise expressly provided in an instrument duly executed by the party or parties hereto.

2.6        **Governing Law.** This Employment Agreement shall be governed by and interpreted and construed in accordance with the Laws of the Province of Québec and the federal laws of Canada applicable therein and the courts of the Province of Québec shall be the sole and proper forum with respect to any suits brought with respect to this Agreement.

2.7        **Conflicting Agreements.** The Employer and the Employee acknowledge that there may be other contracts attached as Schedules to this Employment Agreement. If these Schedules contain terminology, definitions or terms, or create rights or obligations which are at variance or conflict with the terminology, definitions or terms, rights or obligations used or contained in this Employment Agreement, then the parties agree that the terms of this Employment Agreement shall

3

be deemed to set forth their true and complete intention and agreement.

2.8      **PHOENIX.** The term "PHOENIX" used in this Employment Agreement shall mean Phoenix International Life Sciences Inc., a legal person having its head office and principal place of business in the City of St. Laurent, district of Montreal, Quebec, Canada, and its subsidiaries and affiliated companies.

2.9      **Business.** For the purposes of this Employment Agreement, "Business" shall mean, in relation to the Employer, the business now and heretofore and hereafter conducted by PHOENIX to the termination of this Employment Agreement, as well as the business PHOENIX was in the process of actively developing at the time of the termination of this Employment Agreement and of which the Employee was aware. Without limiting the generality of the foregoing, the business at the time of the signing of this Employment Agreement is the business of a multi-service contract research organization ("CRO") which provides discovery, analytical services, preclinical studies, clinical studies, regulatory affairs services and scientific software products and services, to pharmaceutical and biotechnology companies in the United States, Canada, the European Common Market, and Switzerland.

2.10      Schedules: The following Schedules form part of this Employment Agreement:

| Schedule 4.1 | Initial Position Description |
| Schedule 11.5 | Key Employee Share Option Purchase Plan |
| Schedule 14.3 | Change in Control Agreement |

## ARTICLE 3
## DURATION

3.1      This Employment Agreement is hereby concluded for an indeterminate period of time, effective as of 1st February 1999.

## ARTICLE 4
## DUTIES

4.1      As an employee of the Employer, the Employee's duties and responsibilities shall include, above and beyond those inherent to the position set forth in Schedule 4.1 and normally pertaining to it, those compatible with the position and which the Employer may delegate to the Employee from time to time, including but not limited to, holding director or officer positions in PHOENIX and/or one or more of PHOENIX's wholly owned subsidiary companies, as well as

4

performing other duties on behalf of these latter companies as may be required from time to time. The Employee's initial title shall be Senior Vice President and CIO.

4.2    The Employee shall execute all duties and functions from Saint-Laurent but will travel as reasonably required to properly perform the work required of him or her hereunder.

4.3    Without limitation, the Employee acknowledges that the Business depends to a considerable extent on PHOENIX's compliance with regulations, particularly Good Laboratory Practices Regulations and Good Clinical Practices Regulations, governing drug development and issued by the International Committee on Harmonization, regulatory bodies in the U.S.A., Canada and Europe, and other national and international drug regulations. The Employee affirms and agrees that he or she is familiar with all drug regulations relevant to his or her duties, and that he or she will use his or her best efforts to strictly conform with these regulations in carrying out his or her duties.

4.4    The Employee shall report to such person or persons at the Employer that may be designated from time to time, in the execution of his or her duties. Initially, the Employee shall report to John Hooper.

## ARTICLE 5
## LOYALTY

5.1    The Employee shall devote his or her full time, attention, skills and competence to the Employer and to the Business. The Employee shall act with diligence, loyalty and honesty and shall make all necessary efforts to promote the Employer's legitimate business interests during the term of this Employment Agreement.

5.2    Subject to section 5.4, the Employee shall not, during the term of this Employment Agreement, on his own behalf or on behalf of any person, whether directly or indirectly, in any capacity whatsoever, alone, through or in connection with any person, carry on, or be engaged in, or have any financial or other interest in, or be otherwise commercially involved in any endeavor, activity or business which is in competition, in whole or in part, with the Business.

5.3    If the Employee breaches his or her obligations pursuant to section 5.2 above, then the Employer shall be entitled to receive the greater of any profits, benefits or other advantages which may result or ensue from the Employee's activities.

5.4    The Employee shall not be in default under this Employment Agreement by virtue of holding, strictly for portfolio purposes and as a passive investor, no more than five percent (5%) of the issued and outstanding shares of any body corporate which is listed on a recognized stock exchange, the business of which body corporate is in competition, in whole or in part, with the

5

Business.  The five percent (5%) limitation shall not apply to securities which the Employee may hold in a company affiliated with PHOENIX, within the meaning of the *Canada Business Corporations Act.*

## ARTICLE 6
## CONFIDENTIALITY

6.1       The Employee hereby agrees that during his or her employment and for a period of three (3) years following the termination of his or her employment, he or she shall not, directly or indirectly, use, divulge, diffuse, sell, transfer, give, circulate, or otherwise exploit for his or her own benefit or for the benefit of any other person, whatsoever or whomsoever, or otherwise make public, any Confidential Information.

> **"Confidential Information":**  For the purposes of this Employment Agreement, shall mean all information or Works in whatever form (oral, written, machine readable or otherwise) pertaining to the Employer and/or PHOENIX and its Business, operations, properties, assets and liabilities, including, without limitation, files and records pertaining to the Business and trade secrets (including, but not limited to, lists of Customers and suppliers, Customer requirements and practices, costings, equipment, technical information, research results, methodology, supplier availability, business plans, sales methods and ideas, marketing strategy, employee remuneration and benefits and pricing structures and information) as well as all financial information known to the Employee. "Confidential Information" shall also mean information which although not technically a trade secret, may prove prejudicial to the Employer and/or PHOENIX and its Business if disclosed or disseminated, for example, related to products, services, computer software and the activities of PHOENIX or its Customers (whether of a financial, technical or planning nature), but the phrase "Confidential Information" shall not include information which:

> (i)       is in the public domain through no fault of the Employee;

> (ii)      is required by law, governmental authority or a court of law to be disclosed: or

> (iii)     is approved in writing by PHOENIX for disclosure prior to its disclosure.

> **"Customer":** For the purposes of this Employment Agreement shall mean any pharmaceutical manufacturer (regardless of whether or not the Employer and/or PHOENIX has contacted such manufacturer) and any other individual, partnership, legal person or entity for whom the Employer and/or PHOENIX has performed services, or to whom has sold products or licensed computer software or contacted

6

with a view to performing services, selling products or licensing software, during the twelve (12) month period preceding the date of termination of the Employee's employment.

**"Works":** For the purposes of this Employment Agreement, shall mean all Standard Operating Procedures, techniques and methods used to perform research or services, all inventions, improvements, discoveries, literary and artistic works and other original works of any kind or nature whatsoever, industrial designs, trade marks, patents, software programs, source codes and related materials (whether or not registered) and software validation procedures related to the Employer and/or PHOENIX or to the Business.

6.2    Notwithstanding anything to the contrary herein contained, the Employee's covenant set forth in section 6.1 above shall be unlimited as to time insofar as it relates to trade secrets of the Employer, PHOENIX and its Customers, and Confidential Information of Customers.

6.3    Any document or Works composed, assembled or produced by the Employee, or by any employee of the Employer and/or PHOENIX, or any Customer, and containing Confidential Information shall be deemed to be Confidential Information within the meaning of this Employment Agreement and shall be treated as such.

6.4    Confidential Information and all embodiments thereof (including any reproduction) are and shall remain the sole property of the Employer and/or PHOENIX and shall be returned to the Employer and/or PHOENIX immediately on demand, whether before or after termination of this Employment Agreement.

6.5    Notwithstanding any provision hereof, nothing in this Employment Agreement shall prevent the disclosure of Confidential Information if such disclosure must be made in response to the formal request of a governmental body or is otherwise required under any applicable law; it being understood, however, that the Employee shall inform PHOENIX of such a request for disclosure in order that the latter may decide to contest the said disclosure.

6.6    All Works made or conceived in whole or in part by the Employee related to the Business, whether alone or with others, will promptly be disclosed by the Employee to the Employer and/or PHOENIX and will be the sole and exclusive property of PHOENIX, the Employee hereby acknowledging that he or she shall have no right to, or title or interest of any nature whatsoever in such Works, unless otherwise agreed to in writing by PHOENIX. The Employee further agrees to assist PHOENIX and to sign all such documents or do all such things as may be required to protect or to register the Works.

6.7    The Employee agrees that he or she shall not, at any time during the term of his or her employment with the Employer make or cause to be made or remove or cause to be removed

7

from the Employer's possession or premises any documents or materials of any nature whatsoever that are Raw Data, or are based upon Raw Data, unless authorized to do so. For purposes of this Employment Agreement, Raw Data means any worksheets, records, memoranda, notes or exact copies thereof, that are the result of original observations and activities and are necessary or useful or related to a project. Raw Data may include, but is not limited to, photographs, microfilm or microfiche copies, computer printouts, magnetic or optical mass data storage media, including detailed observations and recorded data from automated instruments.

## ARTICLE 7
## OBLIGATION NOT TO COMPETE

7.1       In consideration of the grant of options referred to in article 11.5 hereof by PHOENIX, the Employee covenants and agrees that he or she shall not at any time within the period of one (1) year following the termination of his or her employment hereunder, on his or her own behalf or on behalf of any person, whether directly or indirectly, in any capacity whatsoever, alone, through or in connection with any person, compete or be employed by a business which competes with the Business anywhere within Canada, the United States of America, the European Common Market or Switzerland.

Nothing in this Employment Agreement, including its schedules, is to be interpreted as restricting the Employee from becoming an employee of or being affiliated with any of PHOENIX's Customers. On ceasing to be employed by PHOENIX for any reason, the Employee shall be free to work for any of PHOENIX's pharmaceutical or other Customers, or any other company, except organizations providing contracting services or scientific R&D and testing software to PHOENIX's Customers for a fee.

## ARTICLE 8
## OBLIGATION NOT TO SOLICIT CUSTOMERS

8.1    In consideration of the grant of options referred to in article 11.5 hereof by PHOENIX, the Employee shall not, for a period of one (1) year following the termination of his or her employment, on the Employee's own behalf or on behalf of any person, whether directly or indirectly, in any capacity whatsoever, alone, through or in connection with any person for any purpose which is in competition, in whole or in part, with the Business:

8.1.1        solicit any Customer or aid, procure or assist in the soliciting of any Customer; or

8.1.2        accept, or aid, procure or assist in the acceptance of, any business from any Customer.

8

## ARTICLE 9
## OBLIGATION NOT TO SOLICIT EMPLOYEES

9.1     In consideration of the grant of options referred to in article 12.3 hereof by PHOENIX, the Employee shall not, for a period of one (1) year following the termination of his or her employment, on the Employee's own behalf, or on behalf of any person, whether directly or indirectly, in any capacity whatsoever, alone, through or in connection with any person:

9.1.1          employ, offer employment to, or solicit the employment or engagement of or otherwise entice away from the employment of the Employer and/or PHOENIX any individual who is or was employed by the Employer and/or PHOENIX at any time within the twelve (12) months preceding the termination of the Employee's employment, including but not limited to any employee, contractor, salesman, agent, consultant, distributor, representative, advisor, or supplier of the Employer and/or PHOENIX having received remuneration from the Employer and/or PHOENIX in recognition of services rendered to the Employer and/or PHOENIX; or

9.1.2          aid, procure or assist any person to employ, offer employment or solicit the employment or engagement of or otherwise entice away from the employment of the Employer and/or PHOENIX any individual who is or was employed by the Employer and/or PHOENIX at any time within the twelve (12) months preceding the termination of the Employee's employment, including but not limited to any employee, contractor, salesman, agent, consultant, distributor, representative, advisor, or supplier of the Employer and/or PHOENIX having received remuneration from the Employer and/or PHOENIX for services rendered to the Employer and/or PHOENIX.

## ARTICLE 10
## RECOGNITION

10.1          The Employee hereby expressly recognizes that Articles 6, 7, 8 and 9 of this Employment Agreement are of the essence of this Employment Agreement, and that the Employer would not have entered into this Employment Agreement without the inclusion of these Articles.

9

10.2    The Employee hereby recognizes and expressly acknowledges that Articles 6, 7, 8 and 9 above grant the Employer only such reasonable protection as is admittedly necessary to preserve the legitimate interests of the Employer and also recognizes that in this respect, the description of the Business is reasonable, and hereby agrees to waive (and irrevocably agrees not to raise) as a defense any issue of reasonableness, including, without limitation, arguments as to the duration and scope of the covenants or provisions contained in said Articles.

10.3    The Employee hereby further recognizes and expressly acknowledges: (a) that the application of the aforesaid Articles will not have the effect of prohibiting the Employee from earning a living in a satisfactory manner in the event of termination of his or her employment; (b) that serious and irreparable damage for which monetary damages would not be an adequate remedy would result to the Employer from any violation of the covenants set forth in Articles 6, 7, 8 and 9; and (c) that in addition to any and all remedies available to the Employer in the event of any actual or impending violation of such covenants, the Employer shall have the immediate remedy of injunction or such other relief as may be decreed or issued by any court of competent jurisdiction to enforce the provisions of this Employment Agreement.

10.4    The Employee hereby recognizes that Articles 6, 7, 8 and 9 of this Employment Agreement, being of the essence hereof, shall be interpreted independently from any other provisions of this Employment Agreement, the intention of the parties being to provide for the legitimate and reasonable protection of the interest of the Business and the Employer by providing, among other things, for the broadest scope, the longest duration and the widest territory allowable by law.

## ARTICLE 11
## REMUNERATION BONUS AND SHARE OPTIONS

11.1    As remuneration for his or her services, the Employee shall receive an initial annual base salary in the amount of one hundred forty five thousand dollars ($145,000), less all applicable deductions, plus an expense account up to $10,000 for business purposes, which will be supported by appropriate receipts.

11.2    The base salary shall be subject to an annual review upon each anniversary of the commencement date hereof.

11.3    In addition to the base salary specified above, the Employee will be paid a car allowance of five hundred dollars ($500) monthly. The Employee shall also be reimbursed for mileage traveled in personal automobile up to $5,000 annually.

10

11.4          At the sole discretion of the Board of Directors of PHOENIX, the Employee shall be entitled to receive an annual bonus, based on PHOENIX's Worldwide Executive Remuneration Plan, as same may be amended from time to time.   The initial annual bonus shall be 10% of salary for 100% achievement of corporate budgeted net profit, and 10% of annual salary for 100% of achievement of personal objectives.

11.5          At the sole discretion of the Board of Directors of PHOENIX, the Employee shall be awarded options to purchase PHOENIX shares on the terms and conditions specified in PHOENIX's Key Employee Share Option Plan (Schedule 11.5 hereof) as same may be amended from time to time, the whole subject to regulatory approval, if required. The amounts of these options are as follows:

a)          On approval by the Human Resources Committee of the Board of Directors, 12,500 shares, in addition to those already awarded.

b)          Annually, a number of shares equal to the salary earned by the Employee with the Employer in the previous fiscal year multiplied by 25% and divided by the option price.

11

## ARTICLE 12
## BENEFITS, VACATION and LIABILITY INSURANCE

12.1        Subject to any medical or similar approvals which may be required, the Employee shall have the right to participate in benefit programs and/or plans of the Employer and his or her entitlement to vacation shall be determined and granted in accordance with the policy of PHOENIX at the time the benefits and vacation are granted, provided that the Employee's annual vacation shall not be less than four weeks (20 working days) in each calendar year.

12.2        If the Employee is required to serve as a director or officer of PHOENIX or one of its wholly owned subsidiaries:

12.2.1      PHOENIX shall subscribe for and pay the cost of Directors and Officers liability insurance for the Employee, which insurance coverage shall be no less favorable than the insurance coverage extended by PHOENIX to all of its directors and senior officers;

12.2.2      PHOENIX shall indemnify and hold harmless the Employee against all costs and expenses (including, without limitation, reasonable attorneys fees) if the Employee was or is a party to or threatened to be made a party to or otherwise is involved in any proceeding involving PHOENIX by reason of his or her corporate status or capacity, if the Employee acted in good faith and in a manner which he or she reasonably believed to be in, or not opposed to the best interests of PHOENIX, and with respect to any criminal proceeding, the Employee had no reasonable cause to believe that his or her conduct was unlawful;

12.2.3      Notwithstanding the foregoing, PHOENIX shall not indemnify or hold harmless the Employee in connection with a proceeding initiated by the Employee or a proceeding by the Employee against PHOENIX

## ARTICLE 13
## TERMINATION OF THE EMPLOYMENT AGREEMENT

13.1        The parties hereto acknowledge and expressly agree this Employment Agreement and the Employee's employment shall be terminated in any of the following cases:

            (a)      by the Employer, at any time, for a Serious Reason on simple notice from the Employer to the Employee, the whole without the Employee being entitled to the benefit of any other notice, or, notwithstanding the terms of the Key Employee Share Option Purchase Plan, any unexercised or unvested

12

stock options, or any pay in lieu of notice, or any indemnity whatsoever. For the purpose of this Employment Agreement, a "Serious Reason" means that the Employee:

(i)      has refused to comply with the reasonable instructions given to the Employee in his or her capacity as an executive of the Employer by the Board of directors of the Employer, or Phoenix's Chief Executive Officer, or the person to whom the Employee normally reports;

(ii)     has committed misconduct which is materially detrimental to the Employer or PHOENIX, or has been consistently negligent in the performance of his or her duties hereunder;

(iii)    commits wrongful acts against the interests of the Employer or PHOENIX or against the property of either;

(iv)     is found guilty of an indictable criminal offence or other offence involving fraudulent or dishonest conduct; or

(v)      gives cause to the Employer for dismissal for a reason similar in gravity to those set forth above.

(b)      upon the death, bankruptcy or Incapacity of the Employee, in which case termination shall be automatic, the whole without notice or any pay in lieu of notice or any indemnity whatsoever (except for payments in the ordinary course pursuant to PHOENIX's benefits program by which the Employee may be covered); or

(c)      by the Employee, upon providing the Employer with thirty (30) days notice of resignation; or

(d)      by the Employer, at any time, without cause, in accordance with Article 14.

13.2     **"Incapacity":**  For the purposes of this Employment Agreement, shall mean any medical condition whatsoever, which leads to the Employee's absence from his or her job function for a continuous period of six (6) months, without the Employee being able to resume functions on a full time basis at the expiration of such period and unsuccessful attempts to return to work for periods under fifteen (15) working days shall not interrupt the calculation of the said six (6) month period.

13

13.3      The parties hereby agree that upon termination of this Employment Agreement, all provisions of this Employment Agreement, shall immediately terminate.  Notwithstanding the foregoing, Articles 6, 7, 8,  9 and 10 of this Employment Agreement shall survive any termination hereof and shall remain in full force and effect.

## ARTICLE 14
## TERMINATION WITHOUT CAUSE

14.1      In consideration of the Employee's services and his or her respecting the covenants set forth in Articles 6, 7, 8, 9 and 10 above, the parties agree that if the Employee's employment be terminated by the Employer without cause, the Employee shall receive after the effective date of termination of his or her employment i) all amounts  which are then due and owing to the Employee pursuant to this Employment Agreement, and ii) a further amount (the "Termination Payment") equal to the Employee's gross base annual salary (at the time of notice of termination) divided by 12 and multiplied by the number of complete years (not less than six (6) years) that the Employee has been employed by PHOENIX or any of its subsidiaries or the Employer, less all applicable withholding at source.  The Termination Payment shall be calculated from and as at the date notice of termination is given to the Employee and be payable by the Employer to the Employee following the effective date of termination in monthly installments equal to the Employee's gross base monthly salary.  After payment of the Termination Payment, should the Termination Payment be less than twelve (12) months of the Employee's gross base annual salary (at the time of notice of termination) and should the employee not have found employment with a new employer, the monthly installments shall continue until such time as Employee is again employed, or one year has expired after the effective date of termination, whichever is earlier (the "Additional Monthly Installments").  If the Employee has found new employment, the Additional Monthly Installments shall be adjusted to represent the difference between the Employee's former and new salary, provided that the new salary is less than the former.

Employee benefits and the Employee's car allowance shall continue after the date of termination for twelve (12) months, or until such time as the Employee begins employment with a new employer, whichever is earlier.

14.2      The Employee hereby recognizes and accepts that neither PHOENIX nor its subsidiaries or affiliated companies nor the Employer shall  in any case, be responsible to pay the Employee any additional amount, indemnity in lieu of notice, severance pay or other damages arising from the termination of this Employment Agreement or his or her employment, above and beyond the amounts specifically provided for in section 14.1.

14.3      If the employment of the Employee is terminated hereunder as a result of a Change of Control or Proposed Take-over Bid (within the meaning of and as such terms are defined in the Change of Control Agreement attached hereto as Schedule 14.3), then the terms and conditions of

14

the Change in Control Agreement shall override the provisions hereof, if they are more favorable than those contained herein.

## ARTICLE 15
## COOPERATION WITH EMPLOYER AFTER
## TERMINATION OF THE EMPLOYMENT AGREEMENT

15.1       The Employee hereby undertakes to cooperate with the Employer in all matters related to the conclusion of ongoing work or projects and to facilitate an orderly transfer of responsibilities or functions and duties hereunder to such other employees as may be designated by the Employer.

## ARTICLE 16
## CONFIDENTIALITY OF EMPLOYMENT AGREEMENT

16.1       With the exception of his or her spouse, immediate family and legal and financial advisers, the Employee hereby agrees to keep strictly confidential all information contained in or concerning this Employment Agreement.

## ARTICLE 17

## FINAL PROVISIONS

17.1       Notice.  Any notice, direction or other communication required or permitted to be given hereunder shall be in writing and given by registered mail, hand delivered or sent by telecopier or similar telecommunications device and addressed as follows:

15

(a)     in the case of the Employer, to it at:

(514) 335-8349

and, if the Employer hereunder is a company other than Phoenix International Life Sciences Inc. [Canada], with a copy to:

Phoenix International Life Sciences Inc.
c/o The Chief Executive Officer
2350 Cohen
Ville St. Laurent, Quebec H4R 2N6
Canada

(b)     in the case of the Employee, to him at:

339 Woodcroft
Hudson, Quebec J0P 1H0
Canada

Any notice, direction or other communication given as aforesaid shall be deemed to have been effectively given and received, if by registered mail, then on the date of delivery thereof, if sent by telecopier or similar telecommunications device on the next business day following such transmission or, if hand delivered, to have been given and received on the date of such delivery. Any address for service may be changed by written notice given as aforesaid.

17.2     **Assignment.** Except as otherwise expressly provided for herein, this Employment Agreement, and the rights granted and the obligations incurred hereunder, are not assignable, whether in whole or in part, by the Employee without the prior written consent of PHOENIX.

17.3     **Language.** The parties hereto acknowledge that they have requested and are satisfied that this Employment Agreement and all related documents be drawn up in the English language. Les parties aux présentes reconnaissent avoir requis que la présente entente et les documents qui y sont relatifs soient rédigés en anglais.

16

**IN WITNESS WHEREOF** this Employment Agreement has been executed by the parties hereto on the date and at the place first herein above mentioned:

**SIGNED AND DELIVERED BY:**

Nigel K. Brown, D.Phil.

The Employee

Per:

Phoenix International Life Sciences Inc.

Per:
John W. Hooper, Ph.D.

17

432 of 71 PageID:

Schedule 4.1

**INITIAL POSITION DESCRIPTION**

18

## VICE PRESIDENT, DISCOVERY, ANALYTICAL AND PRECLINICAL

<u>Position Description</u>

**Summary of Functions**

This is a key executive position in the company for a seasoned scientist with business experience or aptitude. Responsible for the strategic management of all Phoenix's worldwide discovery, analytical and preclinical (DAP) research activities.

**Functions**

Develop and implement an outline "Living Strategic Plan" for the company's worldwide DAP activities;

Develp and implement an integration plan to ensure maximum synergy and minimum duplication in Phoenix's worldwide DAP activities;

Identify and evaluate, and if worthwhile conduct preliminary negotiations for selected acquisitions, joint ventures and alliances;

Organize to ensure synergistic automation of DAP functions worldwide;

Identify technology transfer opportunities between Phoenix operations and between outside organizations and Phoenix, and ensure these transfers take place to the maximum benefit of Phoenix;

Perform management audits of various Phoenix DAP business units;

Provide concepts and strategies for effective worldwide marketing of DAP functions, and ensure those that are approved are appropriately implemented;

Play a leading role in devising and recommending internal R&D that will make phoenix a leader in DAP services, thus distinguishing the company from its competitors. Devise, research and make proposals on new DAP services, software and product ideas that build on Phoenix's expertise or exploit market niches;

Attend and contribute to Executive Committee meetings, for those portions of the meetings relevant to worldwide coordination of services.

| | |
|---|---|
| **Reports to:** | Chairman and Chief Executive Officer |
| **Supervises:** | Support staff as assigned |
| **Remuneration:** | Executive level package of salary, car allowance and bonus, plus stock options. |
| **Location:** | Corporate Headquarters, Montréal, Canada. |

19

**Schedule 11.5**

**PHOENIX INTERNATIONAL LIFE SCIENCES INC.
KEY EMPLOYEE SHARE OPTION PURCHASE PLAN**

20

## PHOENIX INTERNATIONAL LIFE SCIENCES INC.
## KEY EMPLOYEE SHARE OPTION PLAN

1.    <u>Purpose</u>.  The Phoenix International Life Sciences Inc. Key Employee Share Option Plan (the "Plan") is intended to attract and retain highly qualified directors and employees who will be motivated toward the success of Phoenix International Life Sciences Inc. ("Phoenix") and to encourage share ownership in Phoenix by such persons.

2.    <u>Number of Common Shares to be Offered</u>.  The shares subject to the options to be granted under this Plan shall be common shares of Phoenix ("Common Shares").  The maximum number of Common Shares that may be issued under this Plan shall not exceed 1,700,000 Common Shares. Upon the expiration, surrender or termination, in whole or in part, of an unexercised option, the Common Shares subject to such option shall be available for other options to be granted from time to time under this Plan.

3.    <u>Terms and Conditions of Option</u>

    (a)    <u>Employee Eligible to Receive Options</u>.  The types of options that may be granted hereunder are "Regular Grants" and "Annual Grants".  The individuals who shall be eligible to receive Regular Grants under this Plan shall be directors, senior executives and key employees of Phoenix and its subsidiaries, while Annual Grants shall be limited to certain senior executives of Phoenix.  A recipient of Options is referred to as an "Optionee".  Options shall be granted by the Compensation Committee of the Board of Directors of Phoenix ("Committee") as it determines from time to time.  The maximum number of Common Shares that may be optioned in favour of any single Optionee will not exceed 5% of the total number of all of the outstanding Common Shares.

    (b)    <u>Option Price</u>.  The price at which Common Shares may be purchased under the Plan shall be the local currency equivalent on the date of grant of the option (the "Grant Date") as determined by the Committee, provided however, that such price may not be less than the average of the market price of the Common Shares for the five-day period immediately preceding the Grant Date.  For the purpose hereof, "market price" shall mean:

        (i)    the average of the high and low prices of the Common Shares on The Montreal Exchange and The Toronto Stock Exchange on a trading day, and

        (ii)    if there was no trade for the Common Shares on one or both of such exchanges on any particular relevant trading day, then the market price will be the average of the bid and ask quotations for the Common Shares on such relevant trading day on such stock exchange.

21

(c)    Option Vesting Schedules.  Options may be exercised at any time and from time to time following their vesting.  The Options vest progressively on each anniversary of the date of granting of the Options according to one of two schedules, either Regular Grants or Annual Grants, as follows:

Regular Grants

| Years Expired Following Date of Options Grant | Cumulative % Vested |
|:---:|:---:|
| 1 | 4% |
| 2 | 16% |
| 3 | 36% |
| 4 | 64% |
| 5 | 100% |

Annual Grants

| Years Expired Following Date of Options Grant | Cumulative % Vested |
|:---:|:---:|
| 1 | 20% |
| 2 | 40% |
| 3 | 60% |
| 4 | 80% |
| 5 | 100% |

On the date which occurs ten years following the date of grant of an option, the option shall expire and terminate and be of no further force or effect whatsoever.

(d)    Methods of Payment.  The Optionee from time to time during the option period may elect to purchase all or part of the Option Shares which the Optionee is entitled to purchase by lump sum payment by delivering to Phoenix a completed stock option purchase form.  Such form shall specify the number of Option Shares the Optionee desires to purchase and shall be accompanied by payment in full of the purchase price for such Option Shares.  Payment can be made by cash, certified cheque, bank draft or money order payable to Phoenix.

22

(e)  <u>Withholding</u>.  No Option Shares shall be issued by Phoenix to an Optionee until appropriate arrangements have been made for the payment of any amounts which may be withheld or paid by Phoenix with respect thereto, including, without limitation, withholding the transfer of a portion of the shares of Phoenix's stock otherwise issuable in order to satisfy all or a portion of the required withholdings or payments.

(f)  <u>Termination of Employment of an Optionee</u>.  In the event that an Optionee's employment with Phoenix or any subsidiary is terminated prior to the date which is ten years following the date of grant of the Optionee's option for any reason other than death, the Optionee's option may be exercised, at any time during the period which is no more than 60 days following the date the Optionee's employment is terminated (but in no event after the date which is ten years following the date of grant of such option), as to such of the Option Shares in respect of which such option has not previously been exercised, but only to the extent that the Optionee was entitled at his termination of employment to purchase such Option Shares then exercisable pursuant to Section 3(c) above; provided, however, that in the event the employment of an Optionee who has received an option under the Plan is terminated as set forth above, the Compensation Committee of Phoenix may, in its own discretion, amend the terms of any option to permit the Optionee to exercise such options as if such Optionee's employment had not been terminated.  For purposes of this Plan, the transfer of an Optionee's employment to Phoenix or to any subsidiary of Phoenix shall not be considered a termination of employment.

(g)  <u>Non-Employee Director Ceasing to Act as Director</u>.  In the event that a non-employee director ceases to act as a director of Phoenix prior to the date which is ten years following the date of grant of the director's options, such non-employee director may exercise, at any time during the 180 days following the announcement of the quarterly results next following the date such director ceases to act as such and prior to the date which is ten years following the date of grant of the director's options, any or all of his options then exercisable pursuant to Section 3(c) above on the date he ceased to act as a director and not previously exercised; those options which are not exercisable pursuant to Section 3(c) above on or prior to the date such director ceased to act as such shall terminate on such date.

(h)  <u>Rights in the Event of an Optionee's Death</u>.  In the event of the death of an Optionee while in the employment of Phoenix or any subsidiary on or prior to the date which is ten years after the date of grant of the Optionee's option, the portion of the Optionee's option which is not exercisable on the date of such Optionee's death, if any, shall be accelerated so that the Optionee's option may be exercised by the Optionee's legal personal representative(s), at any time after the date of the

23

Optionee's death up to and including (but not after) a date which is 180 days following the date of the Optionee's death (but in no event after the date which is ten years following the date of grant of such option), as to any or all of the Option Shares in respect of which such option was granted.

(i)    <u>No Employment Right</u>.  Nothing in this Plan shall confer upon the Optionee the right to continue in the employ of Phoenix or interfere in any way with the right of Phoenix to terminate the Optionee's employment at any time and for any reason.

(j)    <u>No Shareholder Rights</u>.  An Optionee shall have no rights as a shareholder with respect to any Option Shares covered by the Optionee's option until the date of the valid issuance of such shares to the Optionee and only after such shares are fully paid for.  No adjustment will be made for dividends or other distributions or rights for which the record date is prior to the date of such issuance.

(k)    <u>Transfer and Assignment</u>.  The Optionee's rights with respect to options granted under the Plan are not assignable or transferable by the Optionee or subject to any other alienation, sale, hypothec or encumbrance by such Optionee other than by will or by the laws of descent and distribution or pursuant to a qualified domestic relations order as defined by the U.S. Internal Revenue Code.  Therefore, the options are exercisable during the Optionee's lifetime only by the Optionee.  The obligations of each Optionee shall be binding on his heirs, executors and administrators.

(l)    <u>Compliance with United States Securities and Other Laws</u>.  Option Shares may be purchased only if Phoenix has obtained the necessary approvals to sell its Common Shares to Optionees who are citizens of, or who are employed in, the United Sates under applicable United States securities and other laws.

4.    <u>Adjustments</u>.  Upon the happening of any of the following events, an Optionee's rights with respect to options granted under the Plans shall be adjusted as hereinafter provided.

(a)    In the event of any subdivision, redivision or change of the Common Shares into a greater number of shares at any time or in the case of the issue of shares of Phoenix to the holders of its outstanding Common Shares by way of stock dividend or stock dividends (other than an issue of shares to shareholders pursuant to their exercise of options to receive dividends in the form of shares of Phoenix in lieu of cash dividends declared payable in the ordinary course by Phoenix on its Common Shares), the number of Common Shares deliverable by Phoenix upon the exercise of an option shall be appropriately increased proportionately, and appropriate adjustments shall be made in the purchase price per share to reflect such subdivision, redivision or change.

24

(b)     In the event of any consolidation or change of the Common Shares into a lesser number of shares at any time, the number of Common Shares deliverable by Phoenix upon the exercise of an option shall be appropriately decreased proportionately, and appropriate adjustments shall be made in the purchase price per share to reflect such consolidation.

(c)     In the event of any reclassification or reclassifications of the Common Shares, an Optionee shall accept, at the time of purchase of Options Shares, in lieu of the number of Common Shares in respect of which the option to purchase is being exercised, the number of shares of Phoenix of the appropriate class or classes as the Optionee would have been entitled as a result of such reclassification or reclassifications had the option been exercised before such reclassification or reclassifications.

(d)     If Phoenix is to be amalgamated with or acquired by another entity in a merger, a sale of all or substantially all of Phoenix's assets or otherwise (an "Acquisition"), the Committee or the Board of Directors or any entity assuming the obligations of Phoenix under the Plan (the "Successor Board") shall, as to outstanding options, either (i) make appropriate provision for the continuation of such options by substituting on an equitable basis for the shares then subject to such options the consideration payable with respect to the outstanding Common Shares in conjunction with the Acquisition; or (ii) upon written notice to the Optionees, provide that all options must be exercise, to the extent then exercisable, within a specified number of days of the date of such notice, at the end of which period the options shall terminate; or (iii) terminate all options in exchange for cash payment equal to the excess of the fair market value of the shares subject to such options (to the extent then exercisable) over the exercise price thereof.

(e)     In the event of the proposed dissolution or liquidation of Phoenix, each option will terminate immediately prior to the consummation of such proposed action or at such other time and subject to such other conditions as shall be determined by the Committee.

(f)     Except as expressly provided herein, no issuance by Phoenix of shares of any class, or securities convertible into shares of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares subject to options.  No adjustments shall be made for dividends paid in cash or in property other than securities of Phoenix.

(g)     No fractional shares shall be issued under the Plan and the Optionee shall receive from Phoenix cash in lieu of such fractional shares.

25

(h)     Upon the happening of any of the foregoing events described in subparagraphs (a), (b), (c) or (d) above, the aggregate number of shares set forth in paragraph 2 that are subject to options which previously have been or subsequently may be granted under the Plan shall also be appropriately adjusted to reflect the events described in such subparagraphs. The Committee or the Successor Board shall determine the specific adjustments to be made under this paragraph 4 and, subject to paragraph 5, its determination shall be conclusive.

5.     <u>Administration</u>.   This Plan shall be administered by the Compensation Committee. Members of the Committee shall be appointed by the Board of Directors of Phoenix and shall serve as such at the pleasure of the Board of Directors. The Committee shall have full power and authority to designate those directors, senior executive officers and key employees of Phoenix and its subsidiaries who are to be granted options under this Plan, the number of options to be granted and otherwise to interpret and construe the terms and conditions of the options granted under this Plan. Any determination by the Committee shall be final and conclusive unless otherwise determined by the Board of Directors of Phoenix, and in any such event such determination of the Board of Directors shall be final and conclusive. The day-to-day administration of this Plan may be delegated to such officers and employees of Phoenix or of any subsidiary of Phoenix as the Committee in its sole discretion shall determine.

6.     <u>Amendment and Discontinuance</u>. The Board of Directors of Phoenix shall have the right to amend, modify or terminate this Plan or any option granted under this Plan at any time without notice; provided, however, that any such amendment or modification of this Plan which increases the total number of Common Shares which are to be offered under this Plan, as so amended or modified, shall be approved by the shareholders of Phoenix. Any amendment or modification of this Plan or of any option granted under this Plan, will be subject to the prior approval of The Montreal Exchange, The Toronto Stock Exchange and any regulatory body requiring similar approval.

7.     <u>Quebec Stock Savings Plan</u>.  According to the current provisions of the *Taxation Act* (Quebec) (the "Act"), Option Shares issued to an Optionee under the Plan will qualify for inclusion in a Quebec Stock Savings Plan ("QSSP"), subject to certain conditions set forth in the Act. An Optionee who is a Quebec resident on the last day of a year will be entitled to deduct in the calculation of his taxable income the adjusted cost of Option Shares purchased in the year under the Plan and included in a QSSP no later than January 31 of the following year. The adjusted cost will be determined in accordance with the rates of deduction in effect at the time an option is exercised, based however on the characteristics of Phoenix and of the Option Shares at the date of the exemption from filing a prospectus. The deduction allowed for an individual regarding all shares included in a QSSP during a given taxation year, including those purchased under the Plan, may not exceed 10% of his total income for the year. **It is possible that upon exercise of options, the Option Shares then issued by Phoenix may no longer be eligible for inclusion in a QSSP by**

26

reason of amendments which may have been made to the Act subsequent to the date hereof. Accordingly, there is no assurance that at the time of exercise of options, the Option Shares will continue to be eligible for inclusion in a QSSP. Optionees who are resident in Quebec should consult with their tax advisors with regard to questions concerning the QSSP.

8.      Termination of the Plan.  The Plan shall remain effective until terminated by the Board of Directors of Phoenix provided that the termination of the Plan shall have no effect on outstanding options, which shall remain in accordance with their terms and conditions and the terms and conditions of the Plan.

9.      No Corporate Action Restriction.  Nothing contained in the Plan shall be construed to prevent or preclude Phoenix from taking any corporate action which is deemed by Phoenix to be appropriate or in its best interest, whether or not such action would have an adverse effect on the Plan or any option award made under the Plan. No Optionee, beneficiary or other person shall have any claim against Phoenix as a result of such corporate action.

10.     Governing Law.  The Plan and the options granted under the Plan shall be construed in accordance with and be governed by the laws of the Province of Quebec and the laws of Canada applicable therein.

Dated this 30th day of September, 1998.

27

Schedule "A"

**PHOENIX INTERNATIONAL LIFE SCIENCES INC.**
**KEY EMPLOYEE SHARE OPTION PLAN - PURCHASE FORM**

**SECTION A - PURCHASE REQUEST - TO BE COMPLETED BY OPTIONEE**

Name: _____

Mailing Address: _____

Social Insurance Number: _____ Office Tel.: _____
--

Current Position in Company: _____

| Date of Grant Purchase | Number of Options Granted | Number of Options Exercised Hereby* | Exercise Price | Price |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | ____ |
| _____ | _____ | _____ | _____ | ____ |
| _____ | _____ | _____ | _____ | ____ |

Total Purchase Price: _____

Method of Payment: Cash_____ Certified cheque_____ Bank draft _____

I hereby elect to exercise the number of Options to purchase Common Shares of Phoenix International Life Sciences Inc. indicated above*.

Signature: _____ Date: _____

28

If the Common Shares purchased hereby are for inclusion in your Quebec Stock Savings Plan, please provide the name and address of your broker: _____

_____

**SECTION B - VERIFICATION - TO BE COMPLETED BY COMPANY**

I hereby certify that the above individual is eligible to exercise the number of Options as indicated above and acknowledge receipt of payment therefore.

Signature: _____ Date: _____

**INFORMATION FOR TAX PURPOSES**

Market value of Common Shares on exercise date: _____

**SECTION C - RECEIPT OF COMMON SHARES**

I acknowledge receipt of certificate numbers: _____

Signature: _____ Date: _____

29

**Schedule 14.3**

**PHOENIX INTERNATIONAL LIFE SCIENCES INC.**
**CHANGE IN CONTROL AGREEMENT**

30

## CHANGE IN CONTROL AGREEMENT

**THIS AGREEMENT** entered into

BETWEEN:                              **PHOENIX INTERNATIONAL LIFE SCIENCES INC.,**
                                      a company incorporated under the laws of Canada,

                                      ("PHOENIX")

AND:                                  **Nigel K. Brown,** Executive, domiciled and residing at 339
                                      Woodcroft, Hudson, Quebec J0P 1H0

                                      (the "Executive")

**RECITALS**

1.      The Executive is a senior officer of PHOENIX and is considered by the Board of
        Directors of PHOENIX to be a valued employee.

2.      The Board of Directors recognizes that it is essential and in the best interests of
        PHOENIX and its shareholders that PHOENIX retain the dedication of the Executive to
        his or her office and employment.

3.      The Board of Directors further believes that the Executive should receive fair treatment in
        the event of a change in control of PHOENIX.

        **NOW THEREFORE** in consideration of these premises and the mutual covenants
herein contained and in consideration of the Executive continuing in office and in PHOENIX's
employment, PHOENIX and the Executive hereby covenant and agree as follows.

1.      **DEFINITIONS**

        In this Agreement,

        **"Affiliate"** has the meaning ascribed to such word in the *Canada Business Corporations
        Act,* as in force on the date hereof;

31

**"Agreement"** means this agreement as it may be amended or supplemented from time to time, and the expressions "hereof", "herein", "hereto", "hereunder", "hereby" and similar expressions refer to this agreement and, unless otherwise indicated, references to sections are to sections in this agreement;

**"Annual Base Salary"** means the annual salary payable to the Executive by PHOENIX but excludes any bonuses paid to the Executive by PHOENIX;

**"Annual Bonus"** means the amount, if any, paid to the Executive by PHOENIX in a given fiscal year as annual bonus pursuant to the Management Bonus Arrangements;

**"Annual Salary on Termination"** means the Annual Base Salary of the Executive as at the end of the month immediately preceding the month in which the employment of the Executive is terminated pursuant to section 5 hereof;

**"Benefits"** means all benefits including payments pursuant to the Pension Plan, health, dental and life insurance benefits, car allowance and other permitted car expenditures pursuant to PHOENIX's then current policy regarding automobile benefits, and all other then current benefits, the whole on the scale provided by PHOENIX to the Executive as of the date of termination;

**"Change of Control"** means any of:

(i)     the acquisition, directly or indirectly and by any means whatsoever after the date hereof, by any person, or by a group of persons acting jointly or in concert, of that number of Voting Shares which is

      (a)     equal to or greater than 20% of the total issued and outstanding Voting Shares immediately after such acquisition, and includes the acquisition, at such time as the relevant provisions became applicable, of the then current right to exercise the voting rights attached to Voting Shares pursuant to a pledge agreement, voting trust agreement or other agreement; and

      (b)     equal to or greater than the number of Voting Shares held by any other person, or by any other group of persons acting jointly or in concert, immediately after such acquisition and, for this purpose, the Voting Shares subject to a pledge agreement, voting trust agreement or other agreement pursuant to which a person or group of persons has acquired the right to exercise the voting rights attached to such Voting Shares shall be deemed to be held by the person or group of persons who have the right to exercise such voting rights;

where, as a result of such acquisition, such person(s) exert actual control over significant board or management decisions, including the decision to terminate the

32

employment of a senior executive. Without limiting the generality of the foregoing, such person(s) shall be deemed to exercise such actual control, and a Change of Control shall be deemed to have occurred if, following such person(s) acquisition and at its or their instance, the majority of the non-management Directors of PHOENIX resign or are removed;

(ii)     any transaction or series of transactions, whether by way of reconstruction, reorganization, consolidation, amalgamation, arrangement, merger, transfer, sale or otherwise, whereby

(a)     assets of PHOENIX become the property of any other person (excluding a subsidiary of PHOENIX but including a corporation formed upon the amalgamation of PHOENIX with another corporation which is not a wholly-owned subsidiary of PHOENIX) if such assets which become the property of any other person have a fair market value (net of the fair market value of any liabilities which become obligations of such other person as part of the same transaction) equal to one-half or more of the Market Capitalization of PHOENIX immediately before such transaction; or

(b)     PHOENIX is merged, consolidated or reorganized into or with another corporation or other legal person and, as a result, less than a majority of the combined voting power of the then outstanding securities of such corporation or person immediately after such transaction are held in the aggregate by the holders of Voting Shares of PHOENIX immediately prior to such transaction; or

(iii)     the completion of any transaction or the first of a series of transactions which would have the same or similar effect as any transaction or series of transactions referred to in paragraphs (i) and (ii) above;

"Director" means a member of the Board of Directors of PHOENIX;

"Disability" means the mental or physical state of the Executive such that:

(i)     in the determination of the disability insurers of PHOENIX, the Executive is eligible to receive long-term disability payments under any disability insurance contract in effect at that time;

33

(ii)     the Directors of PHOENIX, other than the Executive if he or she is a Director, unanimously determine that the Executive has been unable, due to Incapacity, to fulfil his or her obligations as an employee or officer of PHOENIX. For the purposes of this Change in Control Agreement, "Incapacity" shall mean any medical condition whatsoever, which leads to the Employee's absence from his or her job function for a continuous period of six (6) months, without the Employee being able to resume functions on a full time basis at the expiration of such period and unsuccessful attempts to return to work for periods under fifteen (15) working days shall not interrupt the calculation of the said six (6) month period;

(iii)     a court of competent jurisdiction has determined that the Executive is mentally incompetent or incapable of managing his or her affairs;

and the date on which written notice of any such determination is given to the Executive shall be the effective date of such determination;

"Employment Agreement" means any written agreement between the Executive and PHOENIX relating in whole or in part to the Executive's employment with PHOENIX and in effect on the date of termination;

"Estimated Current Bonus" means an amount equal to the bonus to which the Executive would have been entitled under the Management Bonus Arrangements for the entire fiscal year in which the employment of the Executive is terminated pursuant to section 5 hereof, estimated by annualizing: (i) the year to date performance compared to budget, using the specific criteria established for that year by the Human Resources Committee for the evaluation of the performance of the Executive, and (ii) the percentage fulfilment of the other criteria established for that year by the Human Resources Committee for the evaluation of the performance of the Executive at the time the employment of the Executive is terminated pursuant to section 5 hereof;

"Human Resources Committee" means the Human Resources Committee of the Board of Directors of PHOENIX;

"Improper Change" means:

(i)     any change or series of changes in the responsibilities or status of the Executive with PHOENIX, without the express written consent of the Executive, such that, immediately after such change or series of changes, the responsibilities and status of the Executive, taken as a whole, and taking into account the size and complexity of the business of PHOENIX, are not at least substantially equivalent to those assigned to her immediately prior to such change or series of changes, except a change or series of changes in connection with the termination of the Executive's employment

34

(a)    by PHOENIX for Just Cause or on death, Disability or retirement; or

(b)    by the Executive other than by reason of an Improper Change;

(ii)    any reduction by PHOENIX in the Executive's then current Annual Base Salary other than a general reduction which targets all of the senior executives of PHOENIX or all of the senior executives in a particular division or business unit of PHOENIX;

(iii)    any act or omission by PHOENIX which would materially adversely affect the Executive's participation in, or materially reduce the Executive's benefits under, the package of incentive, compensation, pension, life insurance, health, accident, disability and other similar plans in which the Executive is participating at the date hereof (or such other package or plan as may be implemented after the date hereof providing the Executive with substantially similar benefits), or any act or omission by PHOENIX which would deprive the Executive of any material fringe benefit then currently enjoyed by her;

(iv)    the requirement that the Executive's office or residence be located anywhere other than in the municipality or metropolitan area, as applicable, where the Executive's office or residence is then currently located, except for required travel on PHOENIX's business to an extent substantially consistent with the Executive's then current travel obligations, or in the event the Executive is otherwise prepared to consent to any such relocation, the failure by PHOENIX to pay, or to reimburse the Executive for, all expenses incurred by the Executive in accordance with PHOENIX's then current transfer policy for Executives; or

(v)    any other act or omission or series of acts and omissions which would be considered to amount to constructive dismissal by a court of competent jurisdiction;

"Just Cause" means that the Employee:

(i)    has refused to comply with the reasonable instructions given to the Employee in his or her capacity as an executive of PHOENIX by the Board of directors of PHOENIX, or Phoenix's Chief Executive Officer, or the person to whom the Employee normally reports;

(ii)    has committed misconduct which is materially detrimental to PHOENIX, or has been consistently negligent in the performance of his or her duties hereunder;

35

(iii)   commits wrongful acts against the interests of PHOENIX or against the property of either;

(iv)   is found guilty of an indictable criminal offence or other offence involving fraudulent or dishonest conduct; or

(v)   gives cause to PHOENIX for dismissal for a reason similar in gravity to those set forth above.

**"Legal Control"** means beneficial ownership of, or control or direction over, Voting Shares carrying more than 50% of the votes for the election of Directors of PHOENIX;

**"Management Bonus Arrangements"** means the then current bonus arrangements utilized by PHOENIX and any other program adopted by PHOENIX from time to time with the intention of providing Annual Bonus or similar compensation to the executives of PHOENIX;

**"Market Capitalization of PHOENIX"** at any time means the product of (i) the number of outstanding common shares of PHOENIX at that time, and (ii) the average of the closing prices for the common shares of PHOENIX on the principal securities exchange (in terms of volume of trading) on which the common shares of PHOENIX are listed at that time for each of the last 10 trading days prior to such time;

**"Pension Plan"** means the pension plan or any similar arrangements, as in effect at any time and as amended or supplemented from time to time, and any replacement or successor plan adopted by the Board of Directors and includes, if applicable, the provision by PHOENIX of retirement benefits to the Executive pursuant to any other plan or arrangement by PHOENIX for the benefit of the Executive;

**"person"** includes an individual, partnership, association, body corporate, trustee, executor, administrator, legal representative and any national, provincial, state or municipal government;

**"PHOENIX"** means PHOENIX International Life Sciences Inc. and any or all of its Affiliates, as the case may be;

**"Share Option Plan"** means the Key Employee Share Option Plan of PHOENIX established in 1994, as amended from time to time, any replacement or successor plan and any similar plan of PHOENIX under which PHOENIX from time to time grants options to purchase Voting Shares of PHOENIX;

**"Take-over Bid"** means the making by any person or group of persons, of a take-over bid (as then currently defined in the *Securities Act* (Québec)), for the common shares of PHOENIX, whether made by way of a take-over bid circular or tender offer as required

36

under any applicable legislation, or by way of a stock exchange take-over bid or otherwise, which, if completed in accordance with its terms, would result in such person or group of persons obtaining Legal Control of PHOENIX;

**"Voting Shares"** means any securities of PHOENIX ordinarily carrying the right to vote at elections of directors and any securities immediately convertible into or exchangeable for such securities.

## 2. SCOPE OF AGREEMENT

The parties hereto intend that this Agreement set out:

(i)     their respective rights and obligations on the termination of employment of the Executive subsequent to a Change of Control, other than

      (a)     a termination of employment as a result of the death, Disability or voluntary retirement of the Executive, or

      (b)     a termination of employment by PHOENIX for Just Cause, or

      (c)     a termination of employment by the Executive other than in response to an Improper Change, and

(ii)    the right of the Executive to receive certain compensation in the event of a successful Take-over Bid.

This Agreement does not purport to provide for any other terms of the Executive's employment with PHOENIX nor does it amend any terms of any Employment Agreement except as specifically provided herein.

## 3. RESPONSIBILITIES AND STATUS OF THE EXECUTIVE

Following a Change of Control, PHOENIX may change the Executive's responsibilities and status from time to time provided that such change or series of changes does not constitute an Improper Change.

37

4.    **TERMINATION OF EMPLOYMENT BY PHOENIX FOR JUST CAUSE**

Following a Change of Control, PHOENIX may terminate the Executive's employment at any time for Just Cause without further obligation to the Executive under this Agreement. Notwithstanding the foregoing, the Executive shall not be deemed to have been terminated for Just Cause unless and until there has been delivered to the Executive a copy of a resolution duly adopted by the affirmative vote of the entire membership of the Board of Directors of PHOENIX (excluding the Executive if the Executive is at that time a director of PHOENIX) at a meeting of the Board called and held for that purpose (after reasonable notice to the Executive), finding that, in the good faith opinion of the Board, the Executive's conduct constituted Just Cause. The date on which such resolution is given to the Executive shall be the effective date of any termination pursuant to this section.

5.    **TERMINATION OF EMPLOYMENT WITHOUT JUST CAUSE OR AS A RESULT OF AN IMPROPER CHANGE**

If, at any time within 24 months following a Change of Control, the Executive's employment is terminated (i) by PHOENIX other than for Just Cause or (ii) by the Executive in response to an Improper Change, the following provisions shall apply:

(a)    upon the Executive reimbursing PHOENIX for any loan outstanding or any other amount owed to PHOENIX, the Executive shall be entitled to receive, and PHOENIX shall pay to the Executive, in the currency in which the Executive normally receives salary payments, by certified cheque of PHOENIX to the order of the Executive or otherwise as the Executive may reasonably direct, not later than the 10th day following the date of termination, an amount equal to one time the Annual Salary on Termination less any required statutory deductions and less any amount received as a termination payment pursuant to Executive's employment agreement;

(b)    the Executive shall be entitled to receive, and PHOENIX shall pay to the Executive, in the currency in which the Executive normally receives salary payments, by certified cheque of PHOENIX to the order of the Executive or otherwise as the Executive may reasonably direct, not later than the 10th day following the date of termination, an amount equal to the result of the following calculation, less any required statutory deductions:

38

$$X = 1 \; x \left[ \frac{(\frac{a}{12} \; x \; \text{Estimated Current Bonus}) \; + \; b)}{\frac{a}{12} + 3} \right]$$

where:

*X*       represents the amount to be paid to the Executive

*a*       represents the number of months, rounded up to the next whole number of months, if necessary, which have elapsed in the fiscal year in which the employment of the Executive is terminated pursuant to section 5 hereof prior to the date of termination;

*b*       represents the aggregate of the Annual Bonuses for the three fiscal years immediately preceding the fiscal year in which the employment of the Executive is terminated pursuant to section 5 hereof;

(c)    the Executive shall continue to receive all Benefits until the earlier of (i) the first anniversary of the date of termination of her employment with PHOENIX, and (ii) the date the Executive becomes newly employed or enters into an independent contractor relationship;

(d)    if, at the date of termination of the Executive's employment, the Executive holds options for the purchase of shares under the Share Option Plan which have vested, all options so held shall continue to be held on the same terms and conditions as provided in the case of the termination of employment of an optionee under the terms of the Share Option Plan; and

(e)    if, at the date of termination of the Executive's employment, the Executive holds options for the purchase of shares under the Share Option Plan which have not vested, all options so held shall, notwithstanding the terms of the Share Option Plan or any other agreement relating to such options but subject to any required regulatory or shareholder approvals, (y) immediately vest to the extent that they have not already vested at such date, and (z) continue to be held on the same terms and conditions provided in the case of resignation of a non-employee director of PHOENIX under the terms of the Share Option Plan as if the Executive had been a director who resigned at the date of her termination.

39

Notwithstanding anything to the contrary contained herein but subject to the approval of the Board of Directors of PHOENIX, the Executive may request that the amounts owed to him or her pursuant to (a) and (b) above be paid over a certain period of time.

6.     **TAKE-OVER BID AND UNVESTED OPTIONS**

In the event of a Take-over Bid, all options for the purchase of shares under the Share Option Plan held by an Executive shall, consistent with the terms of the Share Option Plan and notwithstanding any other agreement relating to such options, immediately vest and become exercisable.

7.     **RESTORATION OF STATUS QUO IN THE EVENT OF AN UNCOMPLETED TAKE-OVER BID**

In the event that (i) a Take-over Bid is made, and (ii) any options have become exercisable as a result of the making of the Take-over Bid, whether pursuant to section 6 hereof or pursuant to the terms of such options as granted to the Executive or otherwise, and (iii) the Take-over Bid is subsequently not completed and, as a result, there is no acquisition of Legal Control of PHOENIX, then PHOENIX and the Executive will forthwith negotiate in good faith and thereafter will forthwith take such steps, enter into such agreements, make such payments, issue or convey such securities, and seek such approvals as may be necessary and desirable to restore each of PHOENIX and the Executive as nearly as possible to what would have been the situation had the Take-over Bid not occurred and no options become exercisable as a result of section 6 hereof. It is the intent of the parties to re-establish as closely as possible their respective economic positions as they existed prior to the making of the Take-over Bid, while making allowance for taxation, regulatory and other irreversible events and consequences which may have intervened since the making of the Take-over Bid.

8.     **NO OBLIGATION TO MITIGATE**

The Executive shall not be required to mitigate the amount of any payment or benefit provided for in this Agreement by seeking other employment or otherwise, nor shall the amount of any payment provided for in this Agreement be reduced by any compensation earned or received by the Executive as a result of employment by another employer after termination or otherwise.

40

9.    **BINDING ON SUCCESSORS**

    (i)    PHOENIX shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of PHOENIX, by agreement in form and substance satisfactory to the Executive, acting reasonably, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that PHOENIX would be required to perform it if no such succession had taken place; provided that no such assumption shall relieve PHOENIX of its obligations hereunder to the extent that such obligations are not performed by the successor. Failure of PHOENIX to obtain such agreement prior to the effectiveness of any such succession shall be a breach of this Agreement and shall entitle the Executive to compensation from PHOENIX on the same terms and conditions as that to which the Executive would be entitled hereunder if the Executive terminated his or her employment as a result of an Improper Change pursuant to section 5 hereof. As used in this Agreement, "PHOENIX" shall mean PHOENIX as hereinbefore defined and any successor to its business or assets as aforesaid which executes and delivers the agreement provided for in this section or which otherwise becomes bound by all the terms and provisions of this Agreement by operation of law.

    (ii)    This Agreement shall enure to the benefit of and be enforceable by the Executive's successors or legal representatives, but it is not otherwise assignable by the Executive.

10.    **EXPENSES**

    PHOENIX agrees to pay all reasonable legal fees and expenses incurred by the Executive in connection with any proceedings in which the Executive is substantially successful in obtaining or enforcing any right or benefit provided by this Agreement.

11.    **ENTIRE AGREEMENT**

    This Agreement relates only to the Executive's entitlements on a Change of Control or Take-Over Bid, and constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof. No amendment or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. For greater certainty, in the event that the provisions of this Agreement conflict with or are otherwise inconsistent with the terms of the Employment Agreement, the terms of this Agreement will prevail.

41

12.    **CONFIDENTIAL INFORMATION**

In the event of termination of employment of the Executive, the Executive agrees to keep confidential all information of a confidential or proprietary nature concerning PHOENIX, its operations, assets, finances, business and affairs and further agrees not to use such information for personal advantage, provided that nothing herein shall prevent disclosure of information which is publicly available or which is required to be disclosed under appropriate statutes, rules of law or legal process.

13.    **CHOICE OF LAW**

This Agreement shall be governed and interpreted in accordance with the laws of the Province of Québec and the federal laws of Canada applicable therein and the courts of the Province of Québec shall be the sole and proper forum with respect to any suits brought with respect to this Agreement.

14.    **NOTICES**

Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be given by prepaid first-class mail, by facsimile or other means of electronic communication (if, in the case of the Executive, a facsimile number has been provided or other electronic communication can be received in hard copy form at her address for notice) or by hand-delivery as hereinafter provided.

Any such notice or other communication, if mailed by prepaid first-class mail at any time other than during a general discontinuance of postal service due to strike, lockout or otherwise, shall be deemed to have been received on the fourth business day after the post-marked date thereof, or if sent by facsimile or other means of electronic communication, shall be deemed to have been received on the business day following the sending, or if delivered by hand shall be deemed to have been received at the time it is delivered to the applicable address noted below either to the individual designated below or to an individual at such address having apparent authority to accept deliveries on behalf of the addressee. Notice of change of address shall also be governed by this section.

In the event of a general discontinuance of postal service due to strike, lock-out or otherwise, notices or other communications shall be delivered by hand or sent by facsimile or other means of electronic communication and shall be deemed to have been received in accordance with this section.

Notices and other communications shall be addressed as follows:

(i)    if to the Executive:

42

339 Woodcroft
Hudson, Quebec J0P 1H0
Canada

Telephone:     450-458-5266

(ii)     if to PHOENIX:

Phoenix International Life Sciences Inc.
2350, Cohen St.
Saint-Laurent, Quebec H4R 2N6
Canada

Attention:     Corporate Secretary
Telephone:     (514) 333-0033
Telecopier:     (514) 335-8349


## 15.     CORPORATE APPROVAL; COPY OF AGREEMENT; LANGUAGE

PHOENIX hereby represents and warrants to the Executive that this Agreement has been approved by all required corporate action, including a resolution of the Board of Directors of PHOENIX approving the terms and authorizing the execution hereof.

The Executive hereby acknowledges receipt of a copy of this Agreement duly signed by PHOENIX.

The parties hereby confirm their express wish that this Agreement be drawn up in English only. Les parties confirment par les présentes leur volonté expresse que la présente convention soit rédigée en anglais seulement.

43

**IN WITNESS WHEREOF** the parties hereto have duly executed and delivered this Agreement in St-Laurent on the 1st day of February, 1999.

**PHOENIX INTERNATIONAL LIFE SCIENCES INC.**

by: _____
       John W. Hooper, Ph.D.
       Chairman of the Board

_____
       Nigel K. Brown, D.Phil.

44



*Science Advancing Health*

MDS Inc.                    Tel: 416 675-7661
100 International Blvd.
Toronto, Ontario
Canada, M9W 6J6

**Private & Confidential**
(Revised October 6, 2000)

June 6, 2000

Nigel Brown
339 Woodcroft
Hudson, Quebec
J0P 1H0

Dear Nigel:

**Reference:   Employment Agreement between**
**Nigel Brown and Phoenix International**
**Dated:  1ˢᵗ day of February, 1999**

I am pleased to provide you with this offer of employment as a member of the Senior
Leadership Team for Global Early Stage Development Services.

We are delighted that you have decided to join MDS at such an exciting time in our
history. As you know, the acquisition of Phoenix International is the largest, and perhaps
the most strategic, transaction we have ever done. It will position the combined
organization as a key player in the global marketplace and will put us on a trajectory to
potentially be one of the best clinical research companies in the world.

In your role as Senior Vice President, Preclinical Drug Development Services, you will
report directly to me and work closely with other members of the senior management
team.

The following summarizes the terms and conditions of our offer of employment:

1.   Your base salary will be $175,000 per annum.

2.   You will participate in the Senior Management Bonus Plan. Under this plan, you will
have the opportunity to earn 40% of your base salary. The target award of 30% is
payable for achieving financial, business and individual objectives. An additional
10% is available for organizational and individual performance that exceeds
expectations. The bonus is based on performance over our fiscal year, which ends
October 31ˢᵗ, and is paid within 90 days of the fiscal year end.

**EXHIBIT B**

For fiscal 2000, your objectives will be directly focused on achieving specific milestones related to the combined operations of Phoenix, MDS Harris and MDS Panlabs for the period April 1, 2000 to October 31, 2000. For fiscal 2000, we will guarantee a minimum bonus of 25% of your base salary prorated for the seven months after the close of the deal.

3. MDS will pay you an automobile allowance of $800 per month and provide you with a credit card for gasoline purchases. The allowance is fully taxable at your marginal tax rate.

4. Within forty-five days of the close of the deal, you will be granted options to purchase 10,000 common shares of MDS Inc. under the MDS Employee Stock Option Plan. You will also be eligible for annual grants, which are typically granted in either December or January; you will be eligible for your first annual grant starting with the January 1, 2001 compensation review.

   Your future grants will be a minimum of 75% of you base salary, calculated as follows:

$$\textit{number of options} = \frac{\textit{base salary X grant percent (50\%)}}{\textit{projected share price in 5 years* – current share price}}$$

   \* *we currently assume 10% annual share price growth*

   Under our plan, options vest at a rate of 20% per year starting with the first anniversary of the grant and may be exercised over a maximum ten-year period. The exercise price is determined on the date the grant is approved. All grants are made at the discretion of senior management and are subject to the approval of the Human Resource and Compensation Committee of the MDS Inc. Board of Directors.

5. You will be eligible to participate in the MDS Inc. Executive Group Benefit Plan which provides comprehensive dental and extended health coverage, life insurance, accidental death and dismemberment insurance and long term disability. MDS pays all of the premiums, except for the LTD and optional coverages. Coverage will start at the time the Phoenix plan ceases.

6. You will be eligible to participate in the MDS Senior Management Retirement Program. MDS will pay a benefit equal to 10% of your base salary to the program. The first $13,500 is contributed to a defined contribution pension plan, while the remainder is credited to a non-registered supplementary account.

7. Our vacation year is July 1st – June 30th. You will be provided with 4 weeks vacation immediately.

*Nigel Brown*                                                                                      *Page 3*
*June 6, 2000*
*Confidential*

8.  You will be eligible to participate in the MDS Inc. Employee Share Ownership Plan. We anticipate that we will be rolling out participation in the MDS Employee Share Ownership Plan to Phoenix employees based in Canada and the U.S. on August 1, 2000. Under this plan, you can purchase MDS common shares at a 10% discount to the market. The maximum annual contribution is the lesser of 10% of your base salary and $10,000.

9.  MDS will pay your annual dues, up to a maximum of $1,500 for a fitness club and/or recreation membership. You will also be eligible to participate in the Executive Health Services Program.

10. If your employment is terminated by MDS without cause, we will provide you with transition support as outlined in your employment agreement with Phoenix International (dated February 1, 1999) and the Phoenix Change of Control Agreement. Notwithstanding the foregoing, the terms of the MDS Employee Stock Ownership Plan will govern the treatment of MDS options should your employment with MDS terminate.

The structure of the MDS compensation program has both similarities and differences with the approach taken at Phoenix. To help you fully understand the approach we take at MDS, we will be arranging for you to meet with Keri Humber, who has responsibility for our corporate compensation programs, including executive compensation. He will provide you with the details of the various programs, and assist you in completing the necessary enrolment forms. In addition, as an attachment to this letter we have provided a summary of your total compensation package, illustration of potential gains from the stock option program over the next ten years and projections for the retirement program over the next ten years.

Nigel, as you can appreciate, all material and information concerning our business is highly confidential, and we require that you do not divulge any information of a confidential nature, acquired during the term of your employment, without the prior written consent of MDS. Confidential information is defined as information disclosed to you as an employee as a consequence of your employment by MDS, and is not generally known in the trade or industry in which MDS operates, or that relates to the company's past, present and future products, processes and services. This includes information conceived, originated, discovered, or developed by you, and information relating to he company's research, development, processing, engineering, computer programming and marketing, as well as financial, sales and product planning information.

*Nigel Brown*                                                                                          *Page 4*
*June 6, 2000*
**Confidential**

If you agree with the terms outlined in this letter, please sign it a return a copy to me. I am confident that you will find many exciting and rewarding challenges at MDS.

Yours truly,

ρEλ

Doug Squires
President, Early Stage Development

*I agree to the terms of this letter.*

Nigel Brown                                              06Novo0
Nigel Brown                                              Date